STATE of Minnesota, Respondent,

v.

MOUA HER, Appellant.

No. A06–1743.

Supreme Court of Minnesota.

May 29, 2008.

Suzanne Marie Senecal–Hill, Assistant State Public Defender, St. Paul, MN, for Appellant.

Mitchell Lewis Rotham, Assistant Ramsey County Attorney, Attorney General, St. Paul, MN, for Respondent.

## OPINION

GILDEA, Justice.

Following a jury trial in Ramsey County District Court, appellant Moua Her was convicted of first-degree domestic abuse murder for the stabbing death of his estranged wife, Sheng Vang. Her filed a direct appeal to this court, arguing that the district court erred on Confrontation Clause and hearsay grounds by admitting Vang's out-of-court statements to family and police, that the evidence presented at trial was insufficient to convict him of first-degree domestic abuse murder, and that the district court erred when it denied his motion for a mistrial. We affirm.

The evidence at trial established that Her and Vang met during high school in the late 1990s and that they married in a traditional Hmong ceremony in January 2000. Sometime in February 2001, Vang moved out of the home in which she was living with Her because of "marital difficulties." A short time later, on March 10, the couple, along with family members, held a meeting to address "problems" in the couple's marriage. Family members explained that they were present "to help mediate" the discussion. Her came to the meeting "to beg [the family] to ask Sheng to go back home with him."

One of the problems addressed at the March family meeting was Her's alleged physical abuse of Vang. Vang's cousin testified at Her's trial that during the family meeting Vang said that her husband "kept abusing her." Vang's uncle testified that Vang reported three incidents of abuse at the meeting. First, Vang claimed that Her hit her and when she left, he became so upset that he poured curry juice on her ceremonial wedding garments, damaging them. Second, Vang claimed that Her hit and kicked her.[1] Third, Vang claimed that Her "electrocuted" her.

In response to Vang's allegations at the family meeting, Her cried and admitted that some were true, but said that some were not. Her and his father did agree, however, to pay Vang for the wedding clothes Her allegedly damaged as part of the first incident of abuse. The document reflecting this agreement was introduced into evidence at trial.[2]

Soon after the March meeting, Vang returned to live with Her. The couple's daughter was born in January 2002. But at the end of 2003 or the beginning of 2004, Vang took their daughter and left Her again. Vang left this second time because she was having "a difficult time with her relationship" with her husband.

The evidence showed that the couple continued to have difficulties even after they were no longer living together. One of Vang's coworkers described an incident that occurred in late winter or early spring of 2004 when Her visited Vang at work. The coworker testified that the couple had an agitated conversation and that Vang

---

1. To corroborate this incident, the State introduced evidence that on the day of the alleged abuse, Vang became ill at work and had to call her mother to bring her home. The State also introduced a photograph of Vang's bruised leg, taken in February 2001, allegedly documenting an injury caused by Her's abuse.

2. According to witnesses, the family also tape-recorded the meeting, but the tape itself was not introduced into evidence because it could not be found.

asked Her three times to leave the office. Her walked away only after the coworker stepped into the conversation.

Another incident took place during approximately this same time frame when Her and Vang met at a restaurant in Saint Paul. While at the restaurant, Vang phoned her cousin and asked the cousin to pick her up. The cousin picked up both Her and Vang, then dropped Her off at a bus stop and Vang at her car. The cousin testified that Vang appeared to be afraid when she arrived.

The final incident took place on March 23, 2004, and resulted in Vang calling the police. Saint Paul police officer Amy Baumhofer and her partner were called to a Saint Paul restaurant around 6 p.m. where they met Vang. Officer Baumhofer described Vang as "very upset," "crying," "shaking," and having "a hard time completing sentences." Vang told Baumhofer that Her assaulted her just before the officers arrived. She said that she met Her at the restaurant to talk. During their conversation, Her "pulled [Vang] into the car by her hair and, as she fell into the passenger seat, [he] hit her with what she thought was a metal nightstick several times." As he hit her, Vang screamed and tried to get away. She tried to leave the car, but it was locked. As Her began to back up the car, Vang was able to unlock the door, exit, and call police. Baumhofer testified that she observed "fresh" injury marks under Vang's chin and on her clavicle and stomach. Upon receiving Vang's statement, Baumhofer issued a probable cause pick-up for Her for domestic assault and called for a camera car to photograph Vang's injuries.[3] The photographs documenting Vang's injuries were admitted as evidence during the trial.

As a result of this incident, Her was charged with domestic assault in violation of Minn.Stat. § 609.2242 (2004), but the charge was dismissed for reasons not reflected in the record. Vang also obtained a No Contact Order against Her and on April 26, 2004, she received an Order for Protection against Her.

Approximately 3 months later, on July 18, 2004, Vang was found dead in the garage of the home in which Her was living. That morning, Vang had told relatives that she was going to Her's home to retrieve her citizenship papers, which she needed in order to obtain a passport for a family trip to Thailand. Just before 10 a.m., Vang called her mother and told her that she was almost at Her's house. Sometime between 10 and 10:15 a.m., Her's neighbor heard a "younger woman's voice saying, No," then a "skin-on-skin type slap." The neighbor was standing 25 to 30 feet away from Her's garage at the time. At 11:08 a.m., police were called to Her's home. When the police arrived, Her's mother directed them to the detached garage in back of the house. Inside, officers discovered Vang's body lying face down on the floor with a white handled knife protruding from the side of her neck. Vang had been stabbed 63 times in her head, neck, shoulder, abdomen, back, and hand. The most serious wounds pierced her jugular vein, heart, and lungs. Vang's estimated time of death was approximately 10 a.m.

Police apprehended Her 6 days later at a hotel in Addison, Illinois. He had been driving Vang's car. Along with a check written by Vang and her driver's license, Her's wallet contained Vang's credit cards and receipts from those credit cards for Her's food and lodging while in Illinois. Vang's citizenship papers were also found in the car.

3. The record does not establish which of these two things Baumhofer did first.

Her was arrested and charged in connection with Vang's death. Specifically, the indictment charged Her with first-degree premeditated murder in violation of Minn.Stat. § 609.185(a)(1) (2006); first-degree domestic abuse murder in violation of Minn.Stat. § 609.185(a)(6) (2006); and, second-degree intentional murder in violation of Minn.Stat. § 609.19, subd. 1(1) (2006).

Her's jury trial took place June 5 to 16, 2006. At the end of June 13, the second day of testimony, the district court was notified that several jurors' personal property had been stolen from the jury deliberation room. The court then adjourned for the day in order for jurors to work with sheriff's deputies regarding the investigation into the thefts. Property was stolen from four jurors, including $5–8 from an organizer, a video iPod with a leather case, a driver's license and debit card, and $75 in cash.

The following morning, on its own initiative, the court interviewed each juror regarding the theft. Every juror stated that notwithstanding the theft he or she could continue to pay attention, focus on the trial, listen to the evidence, and fairly consider the case based on the facts. After jury questioning, Her moved for a mistrial. The district court denied the motion and found that the jurors appeared to be handling the situation well, had high spirits, seemed fully engaged in the process, indicated an ability to separate the thefts from their duties as jurors in determining the facts in the case, were giving full attention to the case, and could continue to be fair and impartial. On June 15, the Saint Paul Pioneer Press printed an article about the incident. Shannon Prather, *We the Jury ... Just Got Ripped Off,* St. Paul Pioneer Press, June 15, 2006, at A1. No juror was quoted in the article, and no evidence was presented that any juror read the article.

The jury found Her not guilty of premeditated murder, but guilty of first-degree domestic abuse murder and second-degree intentional murder. The district court convicted Her of first-degree domestic abuse murder and sentenced him to life in prison. This direct appeal follows.

## I.

We first address Her's argument that the admission of Vang's statements at the March 10, 2001, family meeting and to police after the March 23, 2004, incident violated Her's right to confrontation. The Sixth Amendment guarantees the accused the right to confront the witnesses against him. U.S. Const. Amend. VI. The Supreme Court held in *Crawford v. Washington* that the Confrontation Clause prohibits the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." 541 U.S. 36, 53–54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The critical question under *Crawford* is whether the statement at issue is testimonial. *Davis v. Washington,* 547 U.S. 813, 821, 126 S.Ct. 2266, 2273, 165 L.Ed.2d 224 (2006) (Nontestimonial out-of-court statements, "while subject to traditional limitations upon hearsay evidence, [are] not subject to the Confrontation Clause.")[4]; *see also Whorton v. Bockting,* —— U.S. ——, 127 S.Ct. 1173, 1183, 167 L.Ed.2d 1 (2007). The State bears the burden of proving that the statement it seeks to admit is nontestimonial. *State v. Caulfield,* 722 N.W.2d 304,

**4.** In this case, the Supreme Court consolidated two state court cases—*Davis v. State* and *Hammon v. State.* 126 S.Ct. at 2270–73. We cite the case as *Davis* when referring to the opinion as a whole.

308 (Minn.2006). Finally, whether the admission of evidence violates a defendant's rights under the Confrontation Clause is a question of law that we review de novo. *Id.*[5]

### A. Victim's Statements to Family Members

▆▆▆ Her claims that the admission of Vang's statements to family members at the March 2001 meeting violated his right to confrontation. But statements made to non-government questioners who are not acting in concert with or as agents of the government are considered nontestimonial. *State v. Scacchetti,* 711 N.W.2d 508, 514–15 (Minn.2006). We hold that Vang's statements to family members were nontestimonial and that their admission therefore did not violate Her's right to confrontation under the United States Constitution.[6]

### B. Victim's Statement to Police

▆▆▆ Her also argues that Vangs statement to police after the March 2004 assault was testimonial. In *Davis,* the Supreme Court adopted a "primary purpose" test to determine whether a statement made during a police interrogation is testi-monial and thus subject to Confrontation Clause restrictions under *Crawford.* 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224. The *Davis* test provides that statements are nontestimonial when circumstances objectively indicate that the "primary purpose" of the questioning is to enable police to assist in an "ongoing emergency," but are testimonial when the primary purpose is to "establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 2273–74. The essential question is whether, when examined objectively, police sought to determine what was *happening,* rather than what had *happened. See State v. Warsame,* 735 N.W.2d 684, 691 (Minn.2007) (citing *Hammon,* 126 S.Ct. at 2278).

The concurrence argues that the *Davis* "Court's emphasis on primary purpose indicates that inquiries meant to orient the police with a situation are not per se testimonial, even when no emergency exists" and that "[w]ithout making an initial inquiry into what happened, police officers in the field will be simply unable to determine whether, in fact, there is an ongoing emergency and how to respond to the situation at hand." In essence, the concur-

---

5. *Ohio v. Roberts,* the precursor to *Crawford* and *Davis,* required nontestimonial statements to bear "adequate 'indicia of reliability' "—either falling within "a firmly rooted hearsay exception" or bearing "particularized guarantees of trustworthiness." 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (quoting *Mancusi v. Stubbs,* 408 U.S. 204, 213, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972)). In *State v. Martin,* decided before *Davis,* we indicated that nontestimonial statements had to meet the *Roberts* test to be admitted consistent with the Confrontation Clause. 695 N.W.2d 578, 584 (Minn.2005). In light of the Supreme Court's clarification in *Davis,* the *Roberts* test is no longer applicable. As several courts have recognized following *Davis,* if a statement is nontestimonial, the right to confrontation is not implicated. *See, e.g., United States v. Feliz,* 467 F.3d 227, 231 (2d Cir. 2006); *State v. Fischer,* 272 Neb. 963, 726

N.W.2d 176, 181 (2007); *State v. Lewis,* 235 S.W.3d 136, 145 (Tenn.2007).

6. At oral argument, Her suggested that we could interpret the Minnesota Constitution to supply broader Confrontation Clause protections than the United States Constitution and urged that we extend confrontation protection under the Minnesota Constitution to nontestimonial statements. Generally, we "favor[ ] uniformity with the federal constitution." *Kahn v. Griffin,* 701 N.W.2d 815, 824 (Minn. 2005). Her offered no basis upon which we should extend greater protections under our constitution. *See id.* at 829 (discussing "nonexclusive list of factors" relevant to analysis of whether the state constitution affords broader protections). Accordingly, we decline to do so in this case.

rence would hold that because initial police inquiries are designed to determine *if* an emergency is ongoing, they are always nontestimonial. But the Supreme Court rejected just such a per se rule. In *Hammon v. State*, the Indiana Supreme Court had employed the analysis the concurrence posits. 829 N.E.2d 444, 453 (Ind.2005) ("Responses to initial inquiries [by officers] at a crime scene are typically not 'testimonial.' "). The Supreme Court expressly rejected such a rule and the "implication that virtually any 'initial inquiries' at the crime scene will not be testimonial." *Hammon*, 126 S.Ct. at 2279. But the Court "[did] not hold the opposite—that *no* questions at the scene will yield nontestimonial answers." *Id.* The Court said that particularly in domestic dispute situations "[o]fficers called to investigate * * * need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim." *Id.* (quoting *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.*, 542 U.S. 177, 186, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004)) (internal quotation marks omitted) (alteration in original). The Court went on to say that "[s]uch exigencies may *often* mean that 'initial inquiries' produce nontestimonial statements," but where statements are "neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation, the fact that they were given at an alleged crime scene and were 'initial inquiries' is immaterial." *Id.* (citing *Crawford*, 541 U.S. at 52 n. 3, 124 S.Ct. 1354). Consistent with the Court's guidance, our rule of law is not that initial inquiries at the scene are always testimonial or always nontestimonial. Rather, as the Court counseled, the question is to be determined on a case-by-case basis.

Our post-*Davis* precedent confirms that we follow this case-by-case approach in examining whether statements made to police are testimonial or whether the statements are nontestimonial because they relate to an ongoing emergency. *See State v. Wright*, 726 N.W.2d 464, 475–76 (Minn. 2007); *Warsame*, 735 N.W.2d at 691–92. In *Wright*, the assailant pointed a gun at his live-in girlfriend and her sister before leaving the couple's apartment. 726 N.W.2d at 470. The girlfriend called 911, told the operator how she had been threatened, described the assailant in response to operator questioning, and then asked her sister to speak with the operator after police arrived at the apartment. *Id.* at 467–68. The operator determined where the women were in the building and told the sister that police had found Wright and were following him. *Id.* at 468. The operator then learned that Wright was in police custody and informed the sister of that fact. *Id.* In response to the sister's questions and concerns, the operator comforted her and assured her that the situation was under control. *Id.* Following Wright's arrest, police officers interviewed the women in the apartment. *Id.* at 469. We concluded that the entire 911 call was nontestimonial, but that the police interviews at the scene were testimonial because the emergency ended when police took Wright into custody. *Id.* at 476.

In *Warsame*, police responding to a 911 call encountered the victim of a domestic assault walking down the street to the police station. 735 N.W.2d at 687. Before police were able to get out of the squad car or speak to the woman, she spontaneously said that her boyfriend "just beat [her] up." *Id.* An officer determined the woman was associated with the 911 call to which he was responding, saw a large fresh bump on her forehead, and observed her to be "wobbly" and "potentially faint." *Id.* He retrieved a medical bag from his vehicle, checked her injuries, and adminis-

tered first aid. *Id.* As he tended to her injuries, the officer asked the victim an open-ended "what happened" question, which elicited a lengthy statement from the victim describing the assault. *Id.* After describing how her boyfriend hit and choked her, the victim told police that her boyfriend threatened to kill her while wielding a knife and that she feared for her life. *Id.* The officer called an ambulance and during the wait learned more information from the victim. *Id.* She said that she was pregnant and that after the assault her boyfriend left in her vehicle. *Id.* Once the paramedics arrived, the officer entered the victim's home and spoke with her sister. *Id.* at 688. He learned that during the assault the victim's sister attempted to grab the suspect's knife, was cut, and passed out from the injury. *Id.* We concluded that there were three ongoing emergencies in *Warsame:* the victim's medical condition, the defendant's flight, and the victim's sister's injury. *Id.* at 695. Accordingly, we held that statements made before these emergencies ended were non-testimonial. *Id.* at 696.

We analyzed four objective factors in *Wright* and *Warsame* to determine whether the victim's statements to law enforcement related to an ongoing emergency: (1) was the victim describing events as they were actually happening, rather than describing past events; (2) would a reasonable listener recognize that the victim was facing an ongoing emergency and seeking aid rather than just telling a story; (3) were the questions and answers designed to resolve a present emergency rather than learn about past events; and (4) how formal was the interview as evaluated by the victim's demeanor and the environment in which she found herself. *Wright,* 726 N.W.2d at 473 (citing *Davis,* 126 S.Ct. at 2276–77); *Warsame,* 735 N.W.2d at 690

(citing *Davis,* 126 S.Ct. at 2276–77). We follow the same analysis in this case. We begin with a summary of the evidence the State offered about Vang's interaction with police and then examine this evidence under the lens of these four objective factors to determine whether the State proved that Vang's statement to police was non-testimonial.

The only evidence the State offered about Vang's March 2004 statement to police was the testimony of Officer Baumhofer. Baumhofer testified that she was on duty on the day in question and was sent to meet a person at a restaurant at approximately 6 p.m. At the restaurant, she met Vang, who was alone and who said she had been assaulted by her husband who was not at the restaurant when police arrived. Vang said that the assault had happened right before police arrived. Baumhofer described Vang as very upset, but said that she was able to describe the assault after composing herself. Baumhofer observed fresh marks on Vang's chin, clavicle, and stomach, which Vang had said were caused by the assault. Baumhofer issued a call for Her to be arrested and called for a camera car to photograph Vang's injuries.

With regard to the first factor from *Wright* and *Warsame,* the evidence shows that Vang reported a completed assault to police, an event that was over by the time police arrived. The State did not offer any evidence of the 911 call in this case. Rather, the record discloses only that Vang called police to meet her at a restaurant after she had gotten away from her attacker and after her attacker had left the scene. Baumhofer found Vang alone inside the restaurant, expecting police to arrive. From the testimony the State offered, it is clear that Vang described an

event that had ended.[7]

Regarding factors two and three, the State offered no evidence from which a reasonable listener could conclude that there was an ongoing emergency. A comparison of the record in this case with that of *Wright* and *Warsame* makes this clear. Unlike in *Wright*, where we recognized that the emergency continued until the suspect was in custody, the State in this case did not offer any evidence that Vang was afraid or had reason to be afraid that her attacker would return to the scene, or that he continued to be a threat to Vang or anyone else after leaving the scene. *See Wright*, 726 N.W.2d at 469 (discussing victim's ongoing fear of suspect). We also recognized that the emergency continued in *Warsame* until the suspect was apprehended. 735 N.W.2d at 696. But in that case, we noted that an objective observer could conclude from the victim's statements that the suspect was armed with a dangerous weapon, and that because the suspect remained at large the emergency continued. *See id.* at 694 (noting that an ongoing emergency may continue to exist "when a dangerous suspect remains at large"). In this case, Vang's statement indicated that Her used a weapon to assault her—a "metal nightstick." But unlike in *Warsame*, the State did not offer any evidence from which an objective ob-

server could conclude that Her continued to present a danger to police or the public because he had injured or threatened others.

The record does reflect that Baumhofer noticed fresh injury marks on Vang's chin, clavicle, and stomach, but the State did not establish on the record that Baumhofer thought Vang needed any medical attention as a result of these injuries. *Cf. Warsame*, 735 N.W.2d at 693 (concluding "that questions addressing a victim's medical condition may qualify as an interrogation designed to meet an ongoing emergency"). Unlike in *Warsame*, Baumhofer did not retrieve an emergency medical bag or call an ambulance. Rather, she summoned a "camera car" to document Vang's injuries and called for Her to be arrested, but the State did not establish which action Baumhofer took first.[8] In sum, the officer's actions documented in this record do not indicate to an objective observer that police were attempting to *resolve* a present emergency.

Regarding the fourth factor, the record does not reflect the level of formality of the interview, and the State failed to establish whether, like in *Warsame*, Vang simply blurted out her story immediately upon encountering Baumhofer or whether the statement came out in response to formalized questioning.[9] Finally, as to the

7. Baumhofer testified regarding Vang's interrogation:

Q: [W]hat did she tell you had just occurred?
A: She said she had met her husband at the restaurant and that they had been talking. In the course of that conversation, she had been pulled into the car by her hair and, as she fell into the passenger seat, her husband had hit her with what she thought was a metal nightstick several times. As he was hitting her, she was trying to get away and she was screaming for him to stop hurting her. She tried the door and it was locked, and he started to back the vehicle up, and as he did that, she was then able to

unlock the door and get out and call the police.

8. The State asked Baumhofer:

Q: As a result of having observed some marks, scratches, I believe you testified to, did you request assistance to have these marks photographed?
A: Yes.
This testimony confirms that Baumhofer was documenting past events, not seeking to resolve an ongoing emergency.

9. The concurrence speculates that Baumhofer's "questions appear to have been for the purpose of determining whether Vang was in

environment in which the police encountered the victim, while Vang was clearly upset when she spoke to Baumhofer, she does not appear from the record to have been in the same type of vulnerable environment as the victims in *Wright* and *Warsame* when they made statements we found to be nontestimonial. Vang met police inside a public place after she had gotten away from her attacker, and the State did not offer any evidence that Vang said she was afraid that Her was going to find her in the restaurant and continue his attack. *See Warsame*, 735 N.W.2d at 691 (discussing *Hammon*, 126 S.Ct. at 2278, and noting that statements were not related to an ongoing emergency because " 'there was no immediate threat to' " the victim).

For all of these reasons, we conclude that the State did not meet its burden to prove that Vang's statement to police was nontestimonial. We do not hold, as the concurrence states, that Vang's statements to Baumhofer "are inadmissible under *Crawford* * * * and its progeny" because the statements are testimonial. We, in fact, do not make a determination as to the testimonial or nontestimonial nature of the statements. We hold only that the State failed to meet its burden to show that the primary purpose of the interrogation in this case was to address an ongoing emergency.

The concurrence takes a different approach, which ignores the State's burden of proof, and it reaches a conclusion that

the statements were nontestimonial based on its analysis of evidence the State simply did not offer. But as the concurrence reminds us, it is " 'incumbent on courts to be watchful of every inroad on a principle so truly important' " as the right to confrontation. *See infra*, 750 N.W.2d at 284, (Page, J., concurring) (quoting *United States v. Burr*, 25 F. Cas. 187, 193 (C.C.D.Va.1807) (No. 14,694)). Because the principle is so important, the State must be held to its burden before the principle can give way. *See Caulfield*, 722 N.W.2d at 308. The State did not meet that burden here.[10]

## C. Forfeiture by Wrongdoing

■■■■ As an alternative to its argument that Vang's statements were nontestimonial, the State argues that Her forfeited his right to confront Vang by causing her unavailability at trial. Under the forfeiture-by-wrongdoing doctrine, a defendant is, in essence, estopped from asserting his confrontation rights. The doctrine proceeds from the premise that it would be inequitable to permit the defendant to object on confrontation grounds to the statements from a witness whom the defendant prevented from testifying. *See Reynolds v. United States*, 98 U.S. 145, 158, 25 L.Ed. 244 (1878) ("The Constitution does not guarantee an accused person against the legitimate consequences of his own wrongful acts."). In *Crawford*, the Supreme Court reaffirmed its support of the doc-

need of emergency assistance and whether Her was a danger to law enforcement officers or others," and that "[t]he circumstances that caused Officer Baumhofer to ask Vang what had transpired strongly suggest that her purpose was to ascertain whether an ongoing medical or other emergency existed." As demonstrated above, the record contains no support for the concurrence's speculation. Indeed, the State did not offer any evidence of the actual questions Baumhofer asked Vang.

10. Upon a conclusion that testimonial statements were admitted in violation of the Confrontation Clause, we typically proceed to analyze whether the admission was harmless error. *See, e.g., Wright*, 726 N.W.2d at 476–79. The State made no argument that the admission of Vang's statement to Baumhofer was harmless. Accordingly, we do not reach the issue in this case.

trine as an exception to the Confrontation Clause: "[T]he rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially *equitable* grounds." 541 U.S. at 62, 124 S.Ct. 1354 (emphasis added).

We applied the forfeiture-by-wrongdoing doctrine in a case factually similar to this one. *See State v. Langley,* 354 N.W.2d 389, 400 (Minn.1984). In *Langley,* the defendant was found guilty of drowning his estranged wife, Rose, in the bathtub. *Id.* at 391. At trial, the State introduced evidence from Rose's son, three of Rose's friends, Rose's counselor, and a police investigator, all of whom testified to a series of incidents of abuse and threats against Rose by Langley over the years. *Id.* at 396. Langley argued that admission of the evidence of a 4–year–old assault and "hearsay allegations" of subsequent assaults violated his Confrontation Clause rights. *Id.* We held that a defendant cannot invoke his Sixth Amendment rights "as a shield to protect him[self] from the ramifications of having murdered his wife * * * because the evidence is strong that he has been the instrument of the denial of his own right of cross-examination." *Id.* at 400.

Her and the concurrence contend that the forfeiture doctrine does not apply in this case because the State did not prove that Her killed Vang with the specific intent of preventing Vang from being a witness against him.[11] The State contends that forfeiture applies because there is no requirement in a murder case that the

killer's motive be to silence the victim. In *Langley* we did not examine whether the defendant killed his wife in order to silence her. *See* 354 N.W.2d at 400. In *Wright,* however, we remanded the forfeiture issue to the district court and indicated that one of the things the State would need to prove in order to rely on the doctrine was whether the defendant specifically intended to procure the witness's unavailability at trial. *Wright,* 726 N.W.2d at 482.

But *Wright* was not a murder case; it was a domestic assault case where the defendant allegedly tampered with the lead witnesses against him. *Id.* at 470–71. Where a witness is alive and thus theoretically available to testify, but does not appear for some reason, it makes sense to impose a burden on the State to show that the reason the witness does not appear is because the defendant intended to procure her absence. *See id.* at 482. But when a defendant intentionally murders the witness, imposing the additional motive element is inconsistent with the equitable notions underlying the forfeiture-by-wrongdoing doctrine.

Several courts have held, as we did in *Langley,* that forfeiture applies in murder cases without requiring that the State prove that the motive for the murder was the defendant's desire to prevent the victim from testifying. *See United States v. Garcia–Meza,* 403 F.3d 364, 370 (6th Cir. 2005) ("The Supreme Court's recent affirmation of the 'essentially equitable grounds' for the rule of forfeiture strongly suggests that the rule's applicability does

---

11. Her and the concurrence argue that, under majority rule, the forfeiture-by-wrongdoing doctrine requires a finding that Her specifically intended to silence Vang by killing her. Most of the cases Her and the concurrence reference, however, are witness tampering cases, where a witness to a separate crime committed by the defendant is later made unavailable by the defendant's actions. In

these situations, courts often require a showing that the declarant became unavailable to testify at least in part because the defendant intended to cause the declarant's unavailability as a witness. *See, e.g., United States v. Gray,* 405 F.3d 227, 243 (4th Cir.2005) (applying Fed.R.Evid. 804(b)(6) and finding forfeiture). This case does not present such a situation.

not hinge on the wrongdoer's motive."); *United States v. Cromer*, 389 F.3d 662, 679 (6th Cir.2004); *United States v. Mayhew*, 380 F.Supp.2d 961, 970 (S.D.Ohio 2005); *State v. Sanchez*, 341 Mont. 240, 177 P.3d 444, 456 (2008); *People v. Giles*, 40 Cal.4th 833, 55 Cal.Rptr.3d 133, 152 P.3d 433, 443 (2007), *cert. granted*, —— U.S. ——, 128 S.Ct. 976, 169 L.Ed.2d 800 (2008); *State v. Jensen*, 299 Wis.2d 267, 727 N.W.2d 518, 534–35 (2007); *State v. Meeks*, 277 Kan. 609, 88 P.3d 789, 793–94 (2004); *People v. Moore*, 117 P.3d 1, 5 (Colo.Ct.App.2004); *People v. Bauder*, 269 Mich.App. 174, 712 N.W.2d 506, 514–15 (2005).[12] *But see State v. Romero*, 141 N.M. 403, 156 P.3d 694, 703 (2007) (citing Fed.R.Evid. 804(b)(6) and holding that "the prosecution is required to prove intent to procure the witness's unavailability in order to bar a defendant's right to confront that witness"); *Commonwealth v. Laich*, 566 Pa. 19, 777 A.2d 1057, 1062 n. 4 (2001) (citing

Pennsylvania rule of evidence on forfeiture and holding that specific intent to silence is required before the forfeiture doctrine applies in a murder case).[13]

Cases from other jurisdictions likewise recognize the distinction implicit in our cases between a witness tampering case, where intent to silence is required, and a murder case, where the additional element of intent to silence is not required when the defendant is responsible for the death of the witness. *See Sanchez*, 177 P.3d at 455 (discussing distinction); *People v. Melchor*, 362 Ill.App.3d 335, 299 Ill.Dec. 8, 841 N.E.2d 420, 433 (2005) (same).[14] The distinction is grounded in the same equitable principle that underlies the forfeiture doctrine. As the Montana Supreme Court recently noted, the forfeiture doctrine "derives from the maxim that no person should benefit from the person's own wrongdoing. The natural result of a delib-

**12.** *Langley* is thus hardly the "anomalous outlier" the concurrence's research represents it to be. Indeed, some courts apply the forfeiture doctrine more broadly than we have and do not require that the State prove the defendant's intent to silence even in the context of witness tampering. *See State v. Mason*, 160 Wash.2d 910, 162 P.3d 396, 404 (2007) ("The finding of a *specific* intent to keep a witness from testifying argued by [defendant] is more than is warranted by the 'equitable' grounds upon which the rule is based.").

**13.** In contending that we must overrule *Langley*, the concurrence relies extensively (and with emphasis) on the view of one commentator, James F. Flanagan, *Confrontation, Equity, and the Misnamed Exception for "Forfeiture" by Wrongdoing*, 14 Wm. & Mary Bill Rts. J. 1193 (2006). As one of Flanagan's colleagues in the academy notes, however, "[d]espite the fact that historically, forfeiture was limited to witness-tampering cases, after *Crawford* most courts have applied the doctrine to admit statements of murdered domestic violence victims, where witness tampering is not involved." Myrna S. Raeder, *Domestic Violence Cases After* Davis: *Is the Glass Half Empty or Half Full?*, 15 J.L. & Pol'y 759, 778 (2007).

**14.** The cases on which the concurrence relies also recognize this distinction. In *People v. Moreno*, a child witness who claimed to have been sexually abused by the defendant was "medically unavailable" to testify at trial. 160 P.3d 242, 243 (Colo.2007). The court found that the defendant did not forfeit his right to confrontation because he did not intend to cause the unavailability of the witness. *Id.* at 247. Yet it noted that while nonmurder cases require a showing of intent, there may be a "murder exception" to this requirement. *Id.* at 246 (citing *People v. Stechly*, 225 Ill.2d 246, 312 Ill.Dec. 268, 870 N.E.2d 333, 352–53 (2007) ("When a defendant commits murder, notwithstanding any protestation that he did not specifically intend to procure the victim's inability to testify at a subsequent trial, he will nonetheless be sure that this would be a result of his actions. Murder is, in this sense, different from any other wrongdoing in which a defendant could engage with respect to a witness—more than a possibility, or a substantial likelihood, a defendant knows with absolute certainty that a murder victim will not be available to testify.")).

erate killing is *always* that the victim is unavailable to testify." *Sanchez,* 177 P.3d at 456 (internal citations omitted). In that circumstance, where the defendant's "intentional criminal act results in a victim-declarant's death," the defendant will benefit from his "wrongdoing if the defendant can use the death to exclude the victim-declarant's otherwise admissible testimony, regardless of whether the defendant specifically intended to silence the victim-declarant." *Id.* We agree with the Montana Supreme Court that "[s]uch a result undermines the judicial process and threatens the integrity of court proceedings, and though courts may not 'vitiate constitutional guarantees when they have the effect of allowing the guilty to go free,' nor must they acquiesce in the destruction of the criminal-trial system's integrity." *Id.* (citation omitted); *see also United States v. Rouco,* 765 F.2d 983, 995 (11th Cir.1985) (finding, in a case where the defendant was charged with murdering an agent of the United States Bureau of Alcohol, Tobacco and Firearms, that the defendant "waived his right to cross-examine [the agent] by killing him" and stating that "[t]he law simply cannot countenance a defendant deriving benefits from murdering the chief witness against him" (internal quotation omitted)); *Melchor,* 299 Ill.Dec. 8, 841 N.E.2d at 433 (noting that "a defendant should not be allowed to escape the forfeiture by wrongdoing based on his or her motive in killing the victim. Such a rule is certainly logical; otherwise, defendants would be able to profit from their own wrongdoing").

 Her does not dispute that if we apply the forfeiture doctrine in the same way we applied it in *Langley,* he has forfeited his confrontation rights. We require "a compelling reason" to overrule precedent. *See State v. Lee,* 706 N.W.2d 491, 494 (Minn.2005) (internal quotation omitted). The only argument Her offers as to why we should not follow Langley is premised on his citation to *State v. Bradford,* 618 N.W.2d 782 (Minn.2000). But we did not even discuss the forfeiture-by-wrongdoing doctrine in *Bradford* and that case therefore does not provide a reason for us to depart from precedent.

For its part, the concurrence suggests that *Langley* must be overruled because there is no historical support for application of the forfeiture-by-wrongdoing doctrine to the facts presented in *Langley.*[15] The concurrence is mistaken. The basis for the doctrine is the equitable concept that no one should be permitted to profit from his wrongdoing, and this principle has long been a part of the common law. *See Glus v. Brooklyn E. Dist. Terminal,* 359 U.S. 231, 232–33, 79 S.Ct. 760, 3 L.Ed.2d 770 (1959) (citing cases and noting that the principle is "[d]eeply rooted in our

---

**15.** Based on its historical analysis, the concurrence contends that forfeiture cannot apply unless the absent witness previously testified in court against the defendant, was subject to cross-examination by the defendant, and the defendant thereafter kept her from testifying at subsequent proceedings. We agree that the facts of *Reynolds* involved such a situation, but nothing in the Court's formulation of the doctrine in *Reynolds* or its reaffirmation of the doctrine in *Crawford* limits its applicability only to that circumstance. Indeed, if prior testimony were a condition of the doctrine's applicability, the Court would not have reaffirmed it in *Crawford* because the witness at issue there had not been subject to prior cross-examination by the defendant. 541 U.S. at 38, 124 S.Ct. 1354 (noting that a statement given to police was played for the jury "even though [the defendant] had no opportunity for cross-examination" of the witness); *see also Wright,* 726 N.W.2d at 482 (remanding for factual determination of whether the defendant forfeited his confrontation right by procuring the unavailability of the victim and her sister, who had not been subject to earlier cross-examination).

jurisprudence"); *Wellner v. Eckstein*, 105 Minn. 444, 462, 117 N.W. 830, 838 (1908) (Elliott, J., dissenting) ("The doctrine that no man may profit by his own wrong lies deep down among the foundations of English jurisprudence."); Herbert Broom, A Selection of Legal Maxims 204 (3d ed. 1852).[16]

The concurrence also argues that *Langley* must be overruled because of *Davis*. The concurrence's reliance on *Davis* to support its construction of the forfeiture doctrine—that the doctrine applies in murder cases only if the motive for the murder was to prevent the victim from being a witness—is misplaced. The Court in *Davis* expressly noted that it was "tak[ing] no position on the standards necessary to demonstrate * * * forfeiture." 126 S.Ct. at 2280. Nonetheless, the concurrence ar-

gues that Federal Rule of Evidence 804(b)(b) contains an intent requirement[17] and "in *Davis* the Supreme Court acknowledged the constitutional underpinnings of Rule 804(b)(6)" when it observed that the rule "codifies the forfeiture doctrine." *See Davis*, 126 S.Ct. at 2280. While the dicta in *Davis* regarding Rule 804(b)(6) has been interpreted by one court as imposing an intent requirement, *see People v. Moreno*, 160 P.3d 242, 245–46 (Colo.2007), we agree with the greater weight of authority, which holds that this dicta does not impose an intent-to-silence requirement in murder cases. *See Sanchez*, 177 P.3d at 454–55; *Giles*, 55 Cal.Rptr.3d 133, 152 P.3d at 443 & n. 5; *Jensen*, 727 N.W.2d at 534–35; *cf. Crawford*, 541 U.S. at 61, 124 S.Ct. 1354 (noting that the rights secured by the Sixth Amendment do not depend on "the vagaries of the rules of evidence").[18]

**16.** The concurrence also argues that the Supreme Court's adoption of the forfeiture-by-wrongdoing doctrine in *Reynolds* is somehow inconsistent with our application of the doctrine in *Langley*. While the facts of *Reynolds* involved a claim of witness tampering and not murder, the Court did not purport to limit the doctrine only to the witness tampering context. The Court instead adopted a broad formulation of the rule consistent with the equitable principle that underlies the doctrine. *See Reynolds*, 98 U.S. at 159 (rejecting one treatise's "seeming[ ] limit[ation]" of the rule only "to cases where the witness has been *corruptly* kept away" and noting that the only limitation of the rule, which the Court said was "long-established" and "rarely departed from," is that the witness is absent because of "a wrong committed" by the defendant (emphasis added)); *see also McDaniel v. State*, 1 Morr. St. Cas. 336, 16 Miss. 401, 416 (1847) ("It would be a perversion of [the Confrontation Clause's] meaning to exclude the proof, when the prisoner himself has been the guilty instrument of preventing the production of the witness, by causing his death."); *Lord Morley's Case*, 6 How. St. Tr. 770, 770–71 (H.L.1666) (Eng.) (noting that where a witness is absent "by the means" of the accused, the forfeiture rule applies).

**17.** The federal rule provides: "A statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness" is not hearsay. According to the concurrence, "a number of states have encoded the forfeiture exception with the intent requirement intact." Most of the state evidentiary rules cited by the concurrence, however, are nearly identical to Fed. R.Evid. 804(b)(6). *See* Cal. Evid.Code. § 1350(a)(1) (1995); Del. R. Evid. 804(b)(6); Mich. R. Evid. 804(b)(6); N.D. R. Evid. 804(b)(6); Pa. R. Evid. 804(b)(6); Tenn. R. Evid. 804(b)(6); Vt. R. Evid. 804(b)(6). The Minnesota Rules of Evidence do not contain this rule.

**18.** Finally, the concurrence contends that we must overrule *Langley* because in *Davis* the Court said that the forfeiture doctrine applies only "when defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims." *Davis*, 126 S.Ct. at 2280. While the Court in *Davis* acknowledged that "the Sixth Amendment does not require courts to acquiesce" where defendants "*seek to* undermine the judicial process," *id.* (emphasis added), the Court did not say that forfeiture applies "*only*" to that circumstance as the concurrence states. In-

We conclude that *Langley* controls the outcome in this case. As in *Langley*, 354 N.W.2d at 400, we hold that the applicability of the forfeiture-by-wrongdoing doctrine does not depend in this case on the State proving that Her murdered Vang with the specific intent of preventing her from testifying.[19]

At oral argument, Her argued that application of the forfeiture-by-wrongdoing doctrine in this way undermines his presumption of innocence. The applicability of the doctrine depends on a finding that Her was responsible for Vang's death. But Her contends that no determination can be made that he was responsible for Vang's absence until the jury has found him guilty of the murder. This argument does not preclude application of the doctrine here.

 In cases where the forfeiture-by-wrongdoing doctrine is at issue, the district court should resolve the matter consistent with its obligations to make determinations on the admissibility of evidence. *See* Minn. R. Evid. 104 (discussing district court's ruling on admissibility of evidence). As we held in *Wright*, the State must prove, by a preponderance of the evidence, that the defendant is responsible for the witness's absence. *See* 726 N.W.2d at 482. The forfeiture inquiry must be done outside the presence of the jury, and the jury is to be given no information about the court's ruling. *See Mayhew*, 380 F.Supp.2d at 968 (discussing the trial court's preliminary ruling that the defendant was responsible for the death of a witness as basis for application of the forfeiture doctrine and noting that whereas the trial court makes the finding based on a preponderance of the evidence, the jury makes its finding beyond a reasonable doubt).[20]

 The district court in this case did not rule on the forfeiture-by-wrongdoing doctrine apparently because it concluded that the statements were nontestimonial, a conclusion we have now reversed. In such a situation, we normally would remand to the district court for a forfeiture determination. *See Wright*, 726 N.W.2d at 482 (remanding to district court). In *Langley*, however, we decided the forfeiture issue on appeal. 354 N.W.2d at 402. We did so because the weight of the evidence viewed in the light most favorable to the prosecution was "inconsistent with any rational hypothesis except that of [Langley]'s guilt." *Id.* at 396. Similarly in this case, the evidence is strong that Her was responsible for Vang's absence at trial. Her

stead, as noted above, the Court specifically declined to determine the standard necessary for application of the doctrine other than to reaffirm the equitable principle underlying the doctrine. *Id.*

19. While the concurrence protests that our application of the forfeiture doctrine "ignores 20 years of [our] precedent," the concurrence is unable to cite a single example of why that is so. In other words, the concurrence cites no Minnesota case that stands for the proposition that forfeiture will apply in a murder case only if the State proves that the motive for the murder was the defendant's desire to prevent the murder victim from testifying against him. To the contrary, *State v. Black*, cited by the concurrence, supports the appli-

cability of the forfeiture doctrine to any situation where defendant's "wrongdoing" causes the witness to be unavailable. 291 N.W.2d 208, 214 (Minn.1980) ("The law is clear that if a witness is unavailable because of the wrongdoing of the defendant, the defendant cannot complain if other competent evidence is introduced to take the place of the witness'[s] testimony."). Her's wrongdoing—the murder of Vang—plainly qualifies under this formulation of the forfeiture rule.

20. The concurrence's claim that our rule results in forfeiture applying based on "little more than [a defendant's having been] accused of a crime" is simply wrong.

did not present any evidence to the contrary, and he did not deny that he was responsible for Vang's death. The focus of his defense was on the first-degree murder charge. He denied allegations of domestic abuse and denied that he killed Vang with premeditation, and argued instead that he "snapped." Given the state of the record, we decide the forfeiture issue on appeal and hold that Her forfeited his right to confront Vang.[21]

## II.

■ We turn next to Her's argument that Vang's statements to family and police should not have been received into evidence because they were hearsay. We generally will not reverse a district court's evidentiary rulings absent clear abuse of discretion. *Caulfield*, 722 N.W.2d at 308.

### A. Family Member Testimony about Victim's Statements

■ We first consider whether the district court erred by admitting testimony from Vang's family members describing Vang's allegations of abuse. This testimony relates to statements Vang made at the March 2001 family meeting. The State sought to introduce that evidence under Rule 804(b)(5),[22] the residual exception to the rule against hearsay evidence.[23]

■ The residual exception permits the introduction of "[a] statement not specifically covered by rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness." Minn. R. Evid. 807. Trial courts use a "totality of the circumstances" approach, "looking to all relevant factors bearing on trustworthiness," to decide whether an extrajudicial statement has circumstantial guarantees of trustworthiness equivalent to the other hearsay exceptions. *State v. Stallings*, 478 N.W.2d 491, 495 (Minn.1991). Considerations in this analysis include whether the statement was given voluntarily, under oath, and subject to cross-examination and penalty of perjury; the declarant's relationship to the parties and her motivation to make the statement; the extent to which the declarant's statement reflects her personal knowledge; whether the declarant ever recanted her statement; the existence of corroborating evidence; availability of evidence on the issue; reasons for the declarant's unavailability; and the character of the declarant for truthfulness and honesty. *State v. Keeton*, 589 N.W.2d 85, 90 (Minn.1998) (citing *State v. Byers*, 570 N.W.2d 487, 492–93 (Minn.1997)); *see also State v. Daniels*, 361 N.W.2d 819, 830 (Minn.1985); *State v. Hansen*, 312 N.W.2d 96, 101–02 (Minn.1981).

21. While the concurrence contends that our resolution of this issue is "improper," the resolution here is in accord with what other appellate courts have done in murder cases. *See, e.g., Garcia–Meza,* 403 F.3d at 370; *Giles,* 55 Cal.Rptr.3d 133, 152 P.3d at 447; *Meeks,* 88 P.3d at 795.

22. Effective September 1, 2006, Rules 803(24) (availability of declarant immaterial) and 804(b)(5) (declarant unavailable) were combined into the current Rule 807 residual exception. Minn. R. Evid. 807 cmt. In addition to trustworthiness, the prerequisites for admission of a hearsay statement under the residual exception are:

(A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.
Minn. R. Evid. 807.

23. Her notes that the State also argued for the admissibility of these statements under the state-of-mind exception, Minn. R. Evid. 803(3). Because the State does not press this argument on appeal, the 803(3) state-of-mind issue is not before us.

Although not given under oath, subject to formal cross-examination or penalty of perjury, the totality of the circumstances surrounding the statements Vang made at the family meeting indicates that those statements satisfy our test for trustworthiness. *See State v. Robinson*, 718 N.W.2d 400, 410 (Minn.2006) (domestic abuse victim's statement to a nurse contained sufficient circumstantial guarantees of trustworthiness that it was admissible under the residual exception). Vang gave the statements voluntarily, based on firsthand knowledge. She never recanted. Her statements were specific enough that her uncle was able to recall at trial—over 5 years after the family meeting—that Vang alleged three instances of abuse and what each of those instances entailed. The photo of Vang's bruised leg, taken in February 2001, corroborated the allegation that Her hit and kicked her. And the fact that Vang moved away from her husband just weeks before the family meeting implies that Vang genuinely feared for her own safety. Additionally, Her's response to the allegations of abuse—crying and admitting that some of Vang's allegations were true—lends further support for Vang's truthfulness. Because Vang was unavailable to testify at trial, no evidence of these incidents was otherwise available. Finally, the formality of the family meeting indicates that Vang would have had strong incentive to tell the truth about her husband's abuse.[24] We hold that the district court acted within its discretion when it admitted the statements at trial.

## B. Police Testimony about Victim's Statement

 We next consider whether the district court erred by admitting Officer Baumhofer's testimony about the statement Vang made after the March 2004 attack. The State sought to introduce Vang's statements as Rule 803(2) excited utterances. The basic elements of an "excited utterance" are "(a) that there be a startling event or condition, (b) that the statement relates to the event or condition, and (c) that the statement is made under the stress caused by the event or condition." *State v. Edwards*, 485 N.W.2d 911, 914 (Minn.1992) (citing Minn. R. Evid. 803(2)). The district court may exercise its discretion to admit the evidence if it determines that the declarant was "sufficiently under the 'aura of excitement'" when the statement in question was made. *Id.* (quoting *Daniels*, 380 N.W.2d at 782).

Baumhofer testified that Vang was upset, crying, shaking, and having a hard time completing sentences. She observed fresh wounds on Vang, indicating that the assault occurred immediately before police arrived at the restaurant. An assault is a startling event. Baumhofer's description of Vang's condition indicates that she was still under the stress caused by the assault at the time she made the statement. Accordingly, we hold that the district court acted within its discretion when it admitted Baumhofer's testimony about Vang's excited statement to her. *See State v.*

---

24. Her argues that Vang had a financial motive to fabricate her statements of abuse because she sought payment for her damaged wedding garments at the time of the family meeting. But the record reflects that the purpose of the meeting was to help the couple mediate their marital problems, not for Vang to recover money for the damaged clothes. In fact, Her attended the meeting in order to beg for Vang to return home to him. In order to find the truth and help the couple resolve their problems, the family needed to discuss all aspects of the relationship, including the incident when Her hit Vang, she ran out, and he became so upset that he poured curry juice on her ceremonial wedding garments. Finally, Her's written promise to pay for the clothing corroborates the first "hitting" incident and provides further support for Vang's trustworthiness.

*Bauer,* 598 N.W.2d 352, 366 (Minn.1999) (victim's statement to her brother was an excited utterance because she was "very upset," "extremely agitated," and "very afraid"); *State v. Berrisford,* 361 N.W.2d 846, 850 (Minn.1985) (declarant's statement 90 minutes after a murder was an excited utterance because he was "scared," "shaky," and "very upset").

### III.

 We turn next to Her's argument that the evidence was not sufficient to support his conviction for first-degree domestic abuse murder. Specifically, Her argues that the State did not offer sufficient evidence that he engaged in a past pattern of domestic abuse. When reviewing a claim that the evidence was insufficient, we examine "whether the facts in the record and the legitimate inferences drawn from them would permit the jury to reasonably conclude that [Her] was guilty beyond a reasonable doubt" of first-degree domestic abuse murder. *State v. Moore,* 481 N.W.2d 355, 360 (Minn.1992). We view the evidence in the light most favorable to the State and assume that the jury believed the State's witnesses and disbelieved contrary evidence. *Id.* The jury is in the best position to weigh the credibility of the evidence and determine which witnesses to believe and how much weight to give their testimony. *Id.*

 Minnesota Statutes § 609.185(a)(6) provides that whoever "causes the death of a human being while committing domestic abuse, when the perpetrator has engaged in a past pattern of domestic abuse upon the victim * * * and the death occurs under circumstances manifesting an extreme indifference to human life" is guilty of first-degree murder. Domestic abuse is defined as "an act that constitutes one of several forms of assault, criminal sexual conduct, terroristic threats,

or similar acts, and is committed against a household or family member." *State v. Crowsbreast,* 629 N.W.2d 433, 436 (Minn. 2001) (citing Minn.Stat. § 609.185(6) (2000)). The statute does not define the element of "past pattern of domestic abuse," but we have said that "pattern" means individual incidents of abuse "tie[d] together * * * in a way that indicates that domestic abuse was a 'regular way of acting' for [the defendant]." *State v. Clark,* 739 N.W.2d 412, 422 (Minn.2007) (quoting *State v. Robinson,* 539 N.W.2d 231, 237 (Minn.1995)). Further, "the events must be sufficiently proximate in time to constitute a 'pattern.'" *State v. Cross,* 577 N.W.2d 721, 727 n. 3 (Minn.1998).

With respect to the number of past acts required, we have recognized that "[t]he statute does not * * * specify a minimum number of incidents which must be proven in order to find a 'pattern,'" but we have said that the acts "must involve some number of events which bear sufficient relationship to establish a similarity or principle around which they are organized." *Cross,* 577 N.W.2d at 727 & n. 3. We have also held that a single act of domestic abuse is insufficient to constitute a pattern. *State v. Grube,* 531 N.W.2d 484, 491 (Minn. 1995).

The State argues that our decision in *State v. Sanchez–Diaz,* 683 N.W.2d 824 (Minn.2004), stands for the proposition that the "pattern" element is satisfied by proving that the defendant committed at least two acts of abuse. But in *Sanchez–Diaz* we discussed three incidents of domestic abuse in the 2 years before the victim's death. *Id.* at 833. In addition to the three specific instances of abuse, we also considered other evidence showing the pervasive nature of abuse in the relationship. *Id.* In particular, we found that Sanchez–Diaz's statements that the victim feared him and that "everybody knew how

we lived" were evidence that the abuse the defendant admitted "was part of the regular way in which [Sanchez–Diaz] related to the victim." *Id.* at 832–33. Accordingly, our analysis in *Sanchez–Diaz* does not support the State's argument for a bright-line rule that two acts of domestic abuse always constitute a pattern. Moreover, we recently concluded that two incidents of abuse committed within 1 year of the murder were insufficient to establish a regular way of acting. *Clark,* 739 N.W.2d at 422.

■ In sum, whether a past pattern of domestic abuse exists is a fact-intensive inquiry that often is not answered in purely mathematical terms. We do not focus only on the number of incidents of past abuse in order to determine whether a reasonable jury could have found a past pattern of domestic abuse. We consider the number, but we also carefully consider the evidence presented regarding the abuse "and the nature of [the defendant] and victim's relationship as a whole." *Sanchez–Diaz,* 683 N.W.2d at 832.

To prove a past pattern of domestic abuse in this case, the State introduced four instances of physical abuse. The first three were reported by Vang at the family meeting in March 2001, and happened sometime before she moved out of Her's house in February of that year: Her hit Vang, then poured curry juice on her clothes after she left; Her hit and kicked Vang, which caused her to miss work; and Her "electrocut[ed]" Vang. In first-degree domestic abuse murder cases, we have consistently accepted the victim's out-of-court allegations of abuse, if these allegations are otherwise admissible, as evidence establishing a past pattern of abuse. *See Crowsbreast,* 629 N.W.2d at 436 (victim's statements to her mother and a battered women's advocate qualified as past pattern evidence); *Cross,* 577 N.W.2d at 724 (victim's statements to her sister and a friend qualified as past pattern evidence). Vang's three allegations of physical abuse made at the family meeting therefore qualify as past pattern evidence. And even though Her's response to Vang's allegations—crying and saying that some of the allegations were true—was not a full admission or as significant as the admissions in *Sanchez–Diaz,* 683 N.W.2d at 828, Her's response provides further support for the legitimacy of Vang's statements.

■ The fourth incident of abuse occurred at a St. Paul restaurant in March 2004 when Her dragged Vang into a car and hit her with a metal nightstick. Police testimony of a victim's statement of abuse, if admissible, qualifies as past pattern evidence. *See Crowsbreast,* 629 N.W.2d at 435–36.

Her argues that because three years passed between the instances of abuse Vang reported in 2001 and the March 2004 incident, the State did not offer sufficient evidence of a past pattern of domestic abuse. We recently recognized that "some incidents are too distant in time from each other to constitute a pattern or regular way of acting." *Clark,* 739 N.W.2d at 421. But *Clark* involved a couple who had been in a 16–year relationship. *Id.* There was evidence of two acts of abuse in the first few years of the relationship and then a 13–year lapse in the evidence of abuse. *Id.* Given that lengthy lapse, we held that the early acts of abuse were too remote to be considered part of a pattern with the acts committed 13 years later. *Id.*

By contrast, in *Robinson,* the couple's relationship was much shorter in duration, lasting approximately 4 years. 539 N.W.2d at 233. There, we considered acts of abuse committed almost 2 years apart in assessing whether the State met its burden on past pattern. *Id.* at 234, 238. We also noted in that case that the victim had moved out of the couple's home on three

occasions during the relationship. *Id.* at 233.

Just as we declined to adopt a bright-line rule on what number of specific instances of abuse is sufficient to constitute a pattern, we also decline to adopt a bright-line rule establishing a cutoff when acts of abuse will always be too remote to be considered part of a pattern. Our precedent confirms that the question of remoteness is also a fact-intensive inquiry that must be examined on a case-by-case basis and that courts should examine the nature of the relationship as a whole when assessing whether the pattern element is satisfied.

In undertaking that fact-based analysis here, it is clear that this case is much closer to *Robinson* than it is to *Clark* on the question of the acts' temporal relationship to each other. In this case, Her committed four specific acts of domestic abuse over the course of a relatively short relationship. Vang left Her twice during their 3–1/2 year marriage. And even after she left, the couple continued to have what could be characterized as difficult encounters, with the final encounter before Vang's death resulting in an order for protection and charges of domestic assault.

When considering all of the evidence together, including the four specific acts of domestic abuse, Her's admissions and the other evidence about the nature of the couple's relationship, and our standard of review, we conclude that a reasonable jury could find that Her's regular way of behaving toward Vang was to abuse her. We therefore hold that the State provided sufficient evidence that Her had engaged in a past pattern of domestic abuse to support his conviction for first-degree domestic abuse murder.

## IV.

■ We turn next to Her's argument that the district court erred when it denied his motion for a mistrial. We review a district court's denial of a motion for a mistrial for abuse of discretion. *State v. Spann,* 574 N.W.2d 47, 52 (Minn.1998).

Her argues that he was denied a fair trial by an impartial jury when the district court did not declare a mistrial after the theft of the jurors' personal property from the jury deliberation room. Her contends that the jurors became prejudiced when items of their personal property were stolen from the jury room on the second day of testimony, as they heard about Her taking Vang's car to Illinois and using her credit cards to purchase food and lodging along the way.

■ In a situation involving potential misconduct by or affecting the jury, the defendant bears the initial burden to show "private communications or contact or other circumstances suggesting direct or indirect improper influence or jury tampering." *State v. Erickson,* 597 N.W.2d 897, 902 (Minn.1999). Upon such a showing, prejudice is presumed, and the burden shifts to the State to overcome the presumption of prejudice. *Id.* (citing *State v. Anderson,* 379 N.W.2d 70, 81 (Minn.1985)).

In the present case, Her failed to demonstrate that jurors were improperly influenced by the thefts. Defense counsel's only comment to the court was to mention that certain jurors expressed anger about the theft incident or "concern for safety." He made no attempt to show how the seemingly random theft incident or its report in a local newspaper improperly influenced the jury or that the incident in any way implicated the question of Her's guilt or innocence. There was no evidence that the thief was in any way connected to the parties or witnesses in this trial. There also was no evidence that the four jurors who lost property were specifically target-

ed by the incident or that the thief tried to influence or intimidate jurors by breaking into the jury room. *See State v. Richards,* 552 N.W.2d 197, 202–03, 210 (Minn.1996) (concluding that no prejudice arose from an accidental, minimal contact between the defendant and a juror's family friend).

In addition, the district court on its own initiative examined all of the jurors in order to determine whether they could fulfill their duties fairly and impartially or whether they had been influenced by the theft. The record reflects that all of the jurors indicated that notwithstanding the theft, they could remain fair and impartial and would not be distracted by the incident. The judge also reminded the jurors of their obligation to decide the case based only on the evidence received in court.

Her argues that the district court should not have relied solely on testimony from the jurors, but should have assessed whether an objective juror would have been influenced by the theft. We have stated that the proper procedure is to "determine from juror testimony what outside influences were improperly brought to bear upon the jury." *State v. Cox,* 322 N.W.2d 555, 559 (Minn.1982). The district court in this case therefore properly relied on the testimony from the jurors in determining that improper influence had not occurred.

We hold that the district court did not abuse its discretion in denying Her's motion for a mistrial. *See State v. Buford,* 308 N.W.2d 31, 34 (Iowa 1981) (holding that attempted theft from a juror's car did not warrant a mistrial); *State v. Hawkins,* 581 S.W.2d 102, 104 (Mo.Ct.App.1979) (concluding that the district court did not abuse its discretion when it refused to declare a mistrial after money was stolen from a juror's motel room).

Affirmed.

DIETZEN, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

PAGE, Justice (concurring in the result).

Although I would affirm Her's conviction, I would do so on different grounds. I would not, as the court does, stretch beyond all bounds the forfeiture-by-wrongdoing doctrine in order to save this conviction. First, there is no need to apply the forfeiture doctrine; Vang's statements to the police do not run afoul of the Confrontation Clause because they are not testimonial. More importantly, the court's determination that application of the forfeiture doctrine requires no showing that the defendant intended to procure the unavailability of the victim is simply wrong.

I.

Whether Her's conviction for domestic abuse murder under Minn.Stat. § 609.185(a)(6) (2006) should be affirmed hinges on whether Vang's statements to Officer Baumhofer on March 23, 2004, describing an incident of domestic abuse were admissible at Her's trial. On the record presented here, if the victim's statements to the police are inadmissible, then the conviction must be reversed because there would be insufficient evidence to support a critical element of the charged offense—a past pattern of domestic abuse. If the statements are admissible, there is sufficient evidence to support the conviction. The court concludes that these statements are inadmissible under *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and its progeny because the State failed to meet its burden of proof. In essence, however, the court is holding that, based on an objective review

of the facts presented in the record before us, Vang's statements are testimonial.[1] I disagree.

In holding that Vang's statements to the police are testimonial, the court incorrectly reads *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), to hold that a statement to the police is always testimonial except when the statement is made as part of an ongoing emergency. But that is not what the Supreme Court held. The Court expressly held that, for a statement to be testimonial: (1) "the circumstances [must] objectively indicate that there is no such ongoing emergency"; *and* (2) "the *primary purpose of the interrogation* [must be] to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 2273–74 (emphasis added). Thus, the absence of an emergency is not itself determinative of whether a statement is testimonial. Instead, as the Supreme Court in *Davis* made clear, before a statement will be found to be testimonial, there must be a showing that the statement was obtained for a testimonial purpose. *Id.* at 2273. We acknowledged this "primary purpose" requirement in *State v. Warsame*, 735 N.W.2d 684, 693 (Minn.2007) ("[I]nformation about a victim's injury and its cause may be useful in a later prosecution, but for Confrontation Clause purposes, it is the primary purpose of the interrogation that is dispositive.").

Properly read, the Court's emphasis on primary purpose indicates that inquiries meant to orient the police with a situation are not per se testimonial, even when no emergency exists. Whenever the police respond to a call, it is imperative that they be able to quickly obtain the information necessary to keep both themselves and the public safe:

> As first responders to emergencies, police are often required to assess a party's injuries and determine whether those injuries must be immediately addressed and whether the party requires additional assistance from paramedics or other health care professionals. In order to make that assessment, officers must inevitably learn the circumstances by which the party was injured, and if the circumstances of the questions and answers objectively indicate that gaining such information is the primary purpose of the interrogation, then the party's statements are nontestimonial.

*Warsame*, 735 N.W.2d at 693. Without making an initial inquiry into what happened, police officers in the field will be simply unable to determine whether, in fact, there is an ongoing emergency and how to respond to the situation at hand. This analysis of the "purpose" requirement is entirely consistent with the Supreme Court's treatment of "initial inquiries," in which the Court recognized that, in the domestic violence context, police called to the scene need to assess the situation to ascertain the threat to their own and the victim's safety, and that, as a result, the potential for exigencies "may *often* mean that 'initial inquiries' produce nontestimonial statements." *Davis*, 126 S.Ct. at 2279.

There may, of course, be situations in which an officer's initial orientation questions are primarily for the purpose of gathering evidence, as opposed to providing an effective response to the situation at hand. But that is not the situation presented here. Also, at some point the focus of an initial inquiry will shift from an assessment

---

1. To hold that the State failed to meets its burden of proof to show that the statement is nontestimonial is the same as saying that the statement is testimonial, unless the court means to create a third category of "neutral" statements for purposes of Confrontation Clause jurisprudence.

of the situation to an attempt to gather evidence, thus rendering further statements testimonial in nature. The officer's purpose for asking questions in any given case, however, is a determination that will turn on the unique facts of that case.

Objectively looking at the facts of this case, it is apparent that Officer Baumhofer's initial inquiries were not for the purpose of questioning Vang to gather facts concerning past events that would be potentially relevant to a future prosecution. Rather, her questions appear to have been for the purpose of determining whether Vang was in need of emergency assistance and whether Her was a danger to law enforcement officers or others.[2] In that respect, this case is like *Warsame*, a case in which, over my dissent, the court held that the statements in question were nontestimonial. *Warsame*, 735 N.W.2d at 696. Officer Baumhofer testified that, when she arrived at the scene, Vang had fresh marks on her face and neck, was visibly upset, and was unable to speak coherently without great difficulty. An objective observer could have concluded from this that Vang might have needed medical assistance, and would have questioned her to ensure that she was not seriously injured and that no third party remained in danger. Such an objective observer would also have concluded that there was a need to ensure that neither the responding officers nor a third party was in ongoing danger. When Officer Baumhofer asked Vang what had happened, Vang stated that her husband had beaten her with a metal object and had attempted to lock her inside his car shortly before the police arrived. The circumstances that caused Officer Baumhofer to ask Vang what had transpired strongly suggest that her purpose was to ascertain whether an ongoing medical or other emergency existed. The fact that, in the end, Office Baumhofer evidently concluded that no such emergency existed does not make Vang's statements in response to Baumhofer's initial inquiries testimonial.

The four factors we considered in *State v. Wright*, 726 N.W.2d 464 (Minn.2007), further support the conclusion that Officer Baumhofer's questions were for the purpose of determining whether there was an ongoing emergency. As we observed in *Wright*, it is relevant for a court determining the testimonial nature of a statement to ascertain: (1) whether the events described occurred contemporaneously with the questioning or in the past; (2) whether it objectively appeared that the declarant faced an ongoing emergency; (3) whether it objectively appeared that the police questions were necessary to resolve an

2. The court contends that this conclusion is mere speculation because there was no evidence of the "actual questions" asked. While the court is correct that there is no record of the questions asked, that fact, by itself, does not mean that the primary purpose of the questions, if any, that were asked was to establish or prove past events potentially relevant to a future prosecution. *Davis* itself rejected such an overemphasis on the questions asked by law enforcement, pointing out that "even when interrogation exists, it is in the final analysis the declarant's statements, *not the interrogator's questions*, that the Confrontation Clause requires us to evaluate." 126 S.Ct. at 2274 n. 1 (emphasis added). Here, based on a review of the totality of the circumstances presented by the record before us, I conclude that Vang's statement that her husband had beaten her with a metal object was not elicited for the purpose of developing evidence for a future prosecution. If, as the court suggests, the record is inadequate for making that determination, the appropriate response is a remand to the trial court to determine what questions, if any, were asked by Officer Baumhofer. *See Warsame*, 735 N.W.2d at 697 (remanding for further proceedings to properly apply *Davis* standard, with permission to further develop record as appropriate).

emergency; and (4) the circumstances in which the declarant made her statements. *Id.* at 473 (citing *Davis*, 126 S.Ct. at 2276–77).

In addressing the *Wright* factors, it is important to remember that those factors are not a *test*, but merely relevant considerations to be taken into account when addressing the testimonial/nontestimonial distinction. To the extent the *Wright* factors inform the analysis of the purpose behind the questions posed to a witness, I do not question their relevance, but to the extent that other factors might better illuminate the purpose of the officer's inquiries, those factors should be considered as well.

As to the first *Wright* factor, the fact that Vang described incidents that occurred in the past is not determinative of the purpose of the police inquiry. Only in rare instances—such as the 9–1–1 call at issue in *Davis*—will a victim *ever* provide information on the perpetrator's actions as they are happening. Instead, most victims, as in *Warsame*, describe events that occurred in the past. *See* 735 N.W.2d at 687. Yet past events often provide facts about current exigencies—such as the manner in which the witness was injured. Though Vang's statements regarded past actions by her husband, that does not mean that the police only questioned her for the purpose of gathering evidence. Determining whether a person needs immediate medical assistance and, if needed, what that assistance should be, necessarily requires the police to establish how the person's injuries occurred.

The second *Wright* factor—whether one could reasonably conclude that there was an ongoing emergency—has only limited relevance to the determination of the pur-

pose behind police questioning. In some instances, the police could immediately assess that the victim is in no danger and that no emergency exists. *See, e.g., Davis*, 126 S.Ct. at 2271 (noting that victim quickly dispelled any impression of an emergency shortly after arrival of law enforcement). In such circumstances, the obvious lack of an emergency makes it more likely that the primary purpose of the police questioning was to gather evidence, and nothing more. In many circumstances, however, the answers to the officer's initial questions will not dispel that officer's reasonable belief that an emergency exists. The police could come upon an individual who seems calm, for example, only to learn that she is in shock or that a third party is in danger. In this case, Vang initially stated that Her attacked her with a weapon, attempted to kidnap her, and fled. Such statements would not by themselves have dispelled the impression that there existed an ongoing emergency, at least until further details were gathered.

The third *Wright* factor is directly relevant to the assessment of law enforcement purpose. Until it is made clear to responding law enforcement officers that there is no emergency, it is hard to conclude that the officers' purpose in questioning a domestic violence victim is simply to gather evidence. In this case, only after it was made clear to Officer Baumhofer that Vang did not need immediate medical assistance and that Her posed no danger to third parties could we conclude that the purpose of the questioning was to gather evidence.

The last factor—the declarant's demeanor and surroundings—seems designed to further illustrate the purpose of the inquiries by law enforcement.[3] Here, Vang,

---

**3.** If the declarant is in police custody, for example, it is particularly likely that she is in

no danger and that the police questioning is for the purpose of gathering evidence. That

alone in a restaurant, presented fresh marks on her back and neck, and was visibly upset and unable to speak without great difficulty. These facts support the conclusion that Officer Baumhofer's initial inquiries were for the purpose of assessing the situation and not for the purpose of gathering evidence to be used at some later judicial proceeding.

Given the record before us, I conclude that Vang's statements in response to Officer Baumhofer's initial inquiries were nontestimonial. Obviously, at some point during Officer Baumhofer's encounter with Vang the purpose of the officer's inquiries changed. We need not, however, determine the precise point when that change occurred because that point was sometime well after Vang indicated that Her had assaulted her with a metal object. Vang's statement that Her had assaulted her with a metal object was nontestimonial and, therefore, not subject to exclusion under the Confrontation Clause.

Having reached that conclusion, I would also conclude that the statement fell within the excited utterance hearsay exception and was admissible.[4] That evidence, along with the testimony from Vang's cousin that, during the March 10, 2001, meeting of family members, Vang stated that her husband "kept abusing her," as well as Vang's uncle's testimony that, during the same meeting, Vang reported three incidents of abuse, was sufficient to establish the "past pattern of domestic abuse" element required for a conviction under Minn. Stat. § 609.185(6). As a result, I would affirm Her's conviction and end the inquiry.

## II.

I know not why a declaration in court should be unavailing, unless made upon oath, if a declaration out of court was to criminate others than him who made it; nor why a man should have a constitutional claim to be confronted with the witnesses against him, if mere verbal declarations, made in his absence, may be evidence against him. I know of no principle in the preservation of which all are more concerned. I know none, by undermining which, life, liberty and property, might be more endangered. *It is therefore incumbent on courts to be watchful of every inroad on a principle so truly important.*

*United States v. Burr,* 25 F. Cas. 187, 193 (C.C.D.Va.1807) (No. 14,694) (Marshall, C.J.) (emphasis added).

In its most recent pronouncement on the forfeiture-by-wrongdoing doctrine,[5] the

---

does not necessarily mean, however, that there is no emergency. An individual might come to the police station to report that her child is missing, for instance. Her surroundings in that circumstance would indicate that she is not in danger, but no one would doubt that there is an ongoing emergency.

4. Because the court does not make this point explicitly, and because it is of sufficient importance in the post-*Crawford* legal landscape, we must make clear the analysis that should be engaged in whenever a hearsay statement faces a Confrontation Clause objection. For any hearsay statement to be admitted against a criminal defendant, that statement must *both* overcome a Confrontation Clause objec-

tion and fit within a specific hearsay exception.

5. Although the doctrine might more accurately be termed "waiver by wrongdoing," given the requirement that intent be shown, the term "forfeiture" is most commonly used when discussing the doctrine. I attach no significance to the forfeiture label, particularly given the weight of the case law applying the doctrine and the fact that Federal Rule of Evidence 804(b)(6) terms itself a forfeiture rule while requiring that intent to silence the witness be shown. *Contra People v. Giles,* 40 Cal.4th 833, 55 Cal.Rptr.3d 133, 152 P.3d 433, 442–43 (2007), *cert. granted,* — U.S. ——, 128 S.Ct. 976, 169 L.Ed.2d 800 (2008)

United States Supreme Court stated in no uncertain terms that the doctrine is applicable only "when defendants *seek to undermine the judicial process* by procuring or coercing silence from witnesses and victims." *Davis*, 126 S.Ct. at 2280 (emphasis added).[6] In complete disregard of this controlling statement of constitutional law, the court has taken upon itself to craft its own variation of the forfeiture doctrine—under which little more than being accused of a crime is sufficient to forfeit a defendant's confrontation right—simply to save this conviction. Such use of the forfeiture-by-wrongdoing doctrine as a vehicle to make an end run around the Confrontation Clause is not just incorrect as a matter of law, but also bad public policy, in that a forfeiture doctrine lacking the element of intent is entirely limitless in its reach. In sum, today's holding represents a significant undermining of the Sixth Amendment right to confrontation, a departure from the forfeiture doctrine as it was historically understood, and a distortion of the important, yet limited, purpose of the doctrine. In addition, it is in discord with the Court's recent statements in *Davis*, and ignores 20 years of this court's own precedent.

## A. Historical Roots of the Confrontation Clause

The right to confrontation can only be understood in light of its historical roots. *See Crawford*, 541 U.S. at 42–43, 124 S.Ct. 1354 ("The Constitution's text does not alone resolve this case. * * * We must therefore turn to the historical background of the Clause to understand its meaning."). Similarly, exceptions to the confrontation right can be understood only in light of historical practice. *See id.* at 54, 124 S.Ct. 1354 ("The text of the Sixth Amendment does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts. Rather, the [amendment] is most naturally read as a reference to the right of confrontation at common law, *admitting only those exceptions established at the time of the founding.*" (emphasis added)). Thus, both the historical purpose of the confrontation right, as well as the origins of the forfeiture-by-wrongdoing exception to that right, must be examined if we are to understand that exception's application today.

The right to confrontation precedes English law, dating back to at least Roman

(finding significant the use of the word "forfeiture" instead of "waiver"). Even if I did attach significance to the terminology used in describing the doctrine, we have previously treated this doctrine as a waiver of a constitutional right. *See State v. Peirce*, 364 N.W.2d 801, 807–08 (Minn.1985).

**6.** The court asserts that the Supreme Court, despite taking the time in *Davis* to discuss the analytical underpinnings of the forfeiture doctrine, "was 'tak[ing] no position on the standards necessary to demonstrate * * * forfeiture.'" To reach this conclusion, the court reads an isolated phrase out of the context in which it was found. Read in full, the relevant statement reads:

We take no position on the *standards* necessary to demonstrate such forfeiture, but federal courts using Federal Rule of Evidence

804(b)(6), which codifies the forfeiture doctrine, have generally held the Government to the *preponderance-of-the-evidence standard, see, e.g., United States v. Scott,* [284 F.3d 758, 762 (7th Cir.2002)]. State courts tend to follow the same practice, *see, e.g., Commonwealth v. Edwards,* [444 Mass. 526, 830 N.E.2d 158, 172 (2005)].

*Davis*, 126 S.Ct. at 2280 (emphases added). Both cases to which the Court cited discuss the burden of proof which must be met to establish a forfeiture, settling on the preponderance-of-the-evidence standard. *Scott*, 284 F.3d at 762; *Edwards*, 830 N.E.2d at 172. Far from disclaiming any opinion on the forfeiture doctrine itself, this statement reflects only that the Court was not making a final determination as to the burden of proof necessary for establishing a forfeiture.

times. *Crawford,* 541 U.S. at 43, 124 S.Ct. 1354. Following the English conviction and execution of Sir Walter Raleigh for treason on the basis of hearsay evidence, however, that right gained particular prominence in English law. *Id.* at 44, 124 S.Ct. 1354. The absolute necessity of a confrontation right was understood by the founders of this country as well. While the Constitution was being ratified, the Antifederalists harshly criticized the lack of a federal right to confrontation, observing that written evidence offered without a chance for cross-examination was useless in the search for truth. *Id.* at 49, 124 S.Ct. 1354 (citation omitted). The historical importance of the right to confrontation was made even clearer by the right's recognition as a bedrock principle applicable to the states through the 14th Amendment, *Pointer v. Texas,* 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), and the reaffirmation of the right's precedence over considerations of reliability, as well as the established hearsay exceptions, *Crawford,* 541 U.S. at 68–69, 124 S.Ct. 1354.

### B. Origins and Development of the Forfeiture–by–Wrongdoing Exception

#### i. Historical Origins of the Forfeiture Exception

A number of cases from England and this nation's colonial period recognized that a forfeiture of the right to confrontation might be found when a defendant had contrived to prevent a witness from testifying against him. James F. Flanagan, *Confrontation, Equity, and the Misnamed Exception for "Forfeiture" by Wrongdoing,* 14 Wm. & Mary Bill Rts. J. 1193, 1203–05 (2006). Notably, "the facts of [those] cases all involve witnesses rather than victims and acts occurring after the witness had been deposed or had testified[,] acts which are explained only by a desire to prevent testimony." *Id.* at 1203–

04. *Compare Harrison's Case,* 12 How. St. Tr. 834, 851 (Old Bailey 1692) (Eng.) (hearsay statement to coroner admitted where evidence showed defendant's role in witness's subsequent absence), *with Lord Morley's Case,* 6 How. St. Tr. 770 (H.L. 1666) (Eng.) (witness's hearsay statement inadmissible where defendant could not be shown to have caused witness's unavailability).

Importantly, however, English law appears to have treated the forfeiture doctrine as a limited exception to a defendant's right to a *certain kind* of confrontation, rather than an absolute nullification of the confrontation right as a whole. Under English law, it was a "general principle" that "to render a deposition of any kind evidence against a party * * * the party should have an opportunity to cross-examine the witness." Henry Roscoe, *A Digest of the Law of Evidence in Criminal Cases* 71 (4th ed.1852) (citing numerous cases). Simply put, it had to be "shown that the deposition was taken in the presence of the prisoner, and that he had an opportunity of cross-examination." *Id.* When certain circumstances were met, such as when the witness could not be found or the defendant had contrived to prevent the witness from testifying, *see id.* at 69–70 (describing various circumstances in which properly-conducted deposition could be admitted in place of live testimony), a *properly-conducted* deposition by a magistrate, with the defendant present and able to cross-examine the witness, would be admissible into evidence. *See* Robert Kry, *Confrontation Under the Marian Statutes: A Response to Professor Davies,* 72 Brook. L.Rev. 493, 498–502 (2007) (noting historical evidence that forfeiture was only applicable if defendant had opportunity to previously cross-examine

the declarant).[7] Understood this way, it appears that the forfeiture exception itself was originally of limited scope, and barred only the wrongdoer's objection to the absence of the witness at trial, not an objection to the government's total failure to afford him an opportunity for cross-examination.[8]

*Crawford* recognized this aspect of English common law, noting that the pretrial examination of a deceased witness could not be admitted unless the defendant had been given the opportunity to cross-examine that witness. 541 U.S. at 45, 124 S.Ct. 1354 (citing *King v. Paine*, (1696) 5 Mod. 163, 87 Eng. Rep. 584 (K.B.)); *see also* 541 U.S. at 46–47, 124 S.Ct. 1354 (noting numerous other cases requiring prior cross-examination). This was despite the fact that the death, for whatever reason, of a witness was—like a forfeiture under English common law—considered an "exception" permitting the admission of a deposition at trial. *See* Roscoe, *supra*, at 69 ("[I]t is clear that should a witness be proved at the trial * * * to be dead * * * his deposition taken before the magistrate

will be admissible in evidence. So also, if the witness is kept away by the practices of the prisoner." (internal citations omitted)).

*Lord Morley's Case* and *Harrison's Case* had some impact on American jurisprudence, and a number of lower courts later agreed that a defendant's attempt to prevent a witness from appearing in court could permit the admission of hearsay evidence against that defendant. *See, e.g., Bergen v. People*, 17 Ill. 426, 428 (1856) ("It is true, if a party in any case, spirits away his adversary's witness, he ought not to profit thereby * * *."); *Drayton v. Wells*, 10 S.C.L. (1 Nott & McC.) 409, 410–11 (1819) (deeming admissible statements given in a previous trial on same matter if "the witness had been kept away by the contrivance of the opposite party").[9]

Ultimately, in *Reynolds v. United States*, 98 U.S. 145, 25 L.Ed. 244 (1878), the Supreme Court recognized a narrow exception to the confrontation right that reflected the doctrine applied in the early English cases. In that case, Reynolds was accused of bigamy, and his second wife had

---

**7.** It would have been most unusual if, under English law, the mere absence of the declarant—a common occurrence in the hearsay context—were sufficient to eliminate the cross-examination requirement. Rather, it seems most natural to understand admissibility in such instances as resting on two distinct requirements: (1) a deposition at which the defendant was present to conduct a cross-examination; and (2) the existence of some exception, such as a forfeiture or the death of the witness.

**8.** While this may not seem to be a "forfeiture" of anything, one must remember that cross-examination is more than the mere questions and answers, but also a chance to allow the trier of fact to assess for itself the credibility of a witness through the utilization of live testimony. Understood that way, the replacement of a live witness with an impersonal piece of paper would be a substantial forfeiture of an important aspect of a trial, particu-

larly when the witness's credibility is hotly contested.

**9.** As Dean Wigmore would later summarize, "If the witness has been by the opponent procured to absent himself—this ought of itself to justify the use of his deposition or former testimony * * * for any tampering with a witness should once for all estop the tamperer from making any objection based on the results of his own chicanery." John H. Wigmore, *Evidence in Trials at Common Law* § 1405 (James H. Chadbourn rev. ed.1974), *cited in* James F. Flanagan, *Forfeiture by Wrongdoing and Those Who Acquiesce in Witness Intimidation: A Reach Exceeding Its Grasp and Other Problems With Federal Rule of Evidence 804(b)(6)*, 51 Drake L.Rev. 459, 464 (2003). The forfeiture doctrine as set forth in both Wigmore and *Drayton* is entirely compatible with the narrow forfeiture rule embraced at English common law.

testified against him in a previous trial for the same offense. *Id.* at 146, 159.[10] A subpoena was issued for the wife to appear at Reynolds' second trial, but she could not be located at the home she and Reynolds shared. *Id.* at 160. When asked where his wife was to be found, Reynolds simply replied, "[T]hat will be for you to find out." *Id.* Based on those facts, the Court concluded that Reynolds had procured his wife's unavailability so as to prevent her from testifying against him at trial. *Id.* Relying on that conclusion, the Court held that Reynolds' right to confrontation was not violated by the admission of his wife's previous testimony. *Id.*

*Reynolds* reveals the core purpose of the forfeiture exception. Reynolds had not been accused of merely committing a wrongful act, but had been found to have taken positive steps to ensure the absence of a witness against him. It was in this context of *deliberate witness tampering* that the Court stated, as repeated in this court's opinion, that the Constitution "does not guarantee an accused person against the legitimate consequences of his own wrongful acts." *Id.* at 158. *Reynolds* recognized the unique dangers posed by those who exploit the judicial system in the guise of asserting their Sixth Amendment rights, and crafted a *narrow* exception to that core constitutional right. The broad forfeiture doctrine set forth by the court today represents a substantial expansion of that narrow exception, one which finds little support in *Reynolds*.

*Reynolds* also implicitly recognized a prerequisite to application of the forfeiture doctrine that appears to have since been lost: the requirement that the defendant have had a previous opportunity to cross-examine the now-absent witness.[11] In *Reynolds* itself, the testimony to which the defendant objected had been "sworn to by [the missing witness] on a former trial of the accused for the same offence." *Id.* Thus, the hearsay at issue was unique in that it was not merely a declaration that the state sought to admit at trial, but rather testimony that the defendant had already had one opportunity to test by cross-examination.

The Court again addressed the forfeiture doctrine in *Motes v. United States,* 178 U.S. 458, 20 S.Ct. 993, 44 L.Ed. 1150

---

**10.** The court argues that the context in which *Reynolds* arose is irrelevant to any subsequent interpretation of that decision, and that *Reynolds'* broad, general language should itself be determinative. The Supreme Court has flatly rejected such attempts to dissociate its holdings from the context in which they arose. *See Illinois v. Lidster,* 540 U.S. 419, 424, 124 S.Ct. 885, 157 L.Ed.2d 843 (2004) ("We must read this and related general language * * * as we often read general language in judicial opinions—as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering."). Thus, it is hard to cite the general language of *Reynolds* as support for a limitless forfeiture doctrine, given that no opportunity to consider such a doctrine was before the Court at that time.

**11.** The court misreads this statement as an assertion that the modern forfeiture doctrine requires that there be a previous opportunity for cross-examination. Bound as I am by the decisions of the United States Supreme Court, I make no such argument—a point I make clear by noting that the original cross-examination requirement "appears to have since been lost." Rather, I simply point out the historical limitations of the forfeiture doctrine so as to illustrate the extent to which this court now expands that doctrine. Where a forfeiture once required some previous opportunity for cross-examination, this court would now hold that an absolute forfeiture applies categorically to all murder defendants. In other words, what was once a carefully limited exception is now automatically applied. The extent of such a departure from the historical forfeiture doctrine could not be any more clear.

(1900). In that case, unlike *Reynolds*, the witness was unavailable at the defendant's trial not because of any affirmative act by the defendant, but because of the apparent negligence of the government in allowing the witness to escape from custody shortly before the trial. *Id.* at 469, 20 S.Ct. 993. After citing *Reynolds* and other cases as support, the Court stated that it would not be "consistent with the [Confrontation Clause], to permit the deposition or statement of an absent witness (taken at an examining trial) to be read at the final trial, when it does not appear that the witness was absent by the suggestion, connivance or procurement of the accused." *Id.* at 471–74, 20 S.Ct. 993. *Motes* reinforced the point already made clear in *Reynolds* and earlier cases, that a forfeiture must be inexorably linked to a defendant's intentional interference with the judicial process.[12] Also, *Motes* was entirely consistent with a narrow view of the forfeiture doctrine—traceable back to English common law—under which a forfeiture could apply only if a previous opportunity for cross-examination had been presented.

Although the forfeiture doctrine has roots extending back as far as *Reynolds* and English law, it was not until the 1970s that the doctrine began to be applied in our nation's courts. Flanagan, *supra,* at 1203–05, 1208–10.[13] As the doctrine developed, it came to be understood that the forfeiture-by-wrongdoing exception was necessary for the limited purpose of "protecting the integrity of the adversary process by deterring litigants from acting on strong incentives to prevent the testimony of an adverse witness." *Steele v. Taylor,* 684 F.2d 1193, 1201–02 (6th Cir.1982).[14] Accordingly, by the 1990s, it was well-

---

**12.** The Court in *Motes* observed that the forfeiture doctrine was originally applicable, as a general rule, only to the witness' sworn testimony before a magistrate or a coroner. 178 U.S. at 472, 20 S.Ct. 993. That the doctrine could only be triggered once the hearsay declarant had become an actual witness in the proceedings further indicates that the forfeiture doctrine is meant to prevent the defendant from interfering with that witness at a later time.

**13.** As one commentator observes, it appears that the newfound interest in the forfeiture exception at this particular point in time was a response to the problems of witness tampering and loss of testimony that accompanied the war on organized crime and illegal narcotics. James F. Flanagan, *Forfeiture by Wrongdoing and Those Who Acquiesce in Witness Intimidation: A Reach Exceeding Its Grasp and Other Problems With Federal Rule of Evidence 804(b)(6),* 51 Drake L.Rev. 459, 466 (2003).

**14.** The court makes the unusual claim that the intent requirement of the forfeiture doctrine is inapplicable *because* Her has not been accused of witness tampering. In essence, the court has come to the circular conclusion that, when a defendant has not acted with the intent to disrupt the judicial process, no intent need be proven in order to find a forfeiture. Notably, the court cites no cases giving any plausible rationale for such a proposition. Rather than providing any real support, the fact that witness tampering is not presently at issue actually undermines the court's conclusions, given that the forfeiture doctrine's purpose is to *prevent* witness tampering. Here, the court ignores the fact that the very purpose of the forfeiture doctrine is to address the unique problems presented by witness tampering, not the general problems presented whenever a prosecution witness happens to be unavailable. It is no mere coincidence that the intent requirement, at least pre-*Crawford,* appeared so regularly in witness tampering cases—those cases all involve individuals acting on the strong incentive to eliminate adverse witnesses. It is also not a mere coincidence, *State v. Langley,* 354 N.W.2d 389 (Minn.1984), notwithstanding, that there are so few forfeiture cases involving absent witnesses that do not involve the intentional tampering with a witness. When the court observes that witness tampering is not at issue in this case, it admits that the key concern behind the forfeiture doctrine—a defendant's incentive to eliminate adverse witnesses—is lacking.

established that, for a forfeiture to apply, a "declarant-witness must be unavailable because of wrongdoing done by the defendant *that was intended to and did procure the witness's absence.*" Flanagan, *supra,* at 1210–11 (emphasis added).[15] This intent requirement is implicated in a substantial number of the cases that have addressed the issue. *See, e.g., United States v. Houlihan,* 92 F.3d 1271, 1279 (1st Cir.1996); *United States v. Thevis,* 665 F.2d 616, 630 (5th Cir.1982), *superseded by rule on different grounds,* Fed.R.Crim.P. 804(b)(6), *as recognized in United States v. Zlatogur,* 271 F.3d 1025, 1028 (11th Cir. 2001); *United States v. Carlson,* 547 F.2d 1346, 1359–60 (8th Cir.1976); *People v. Moreno,* 160 P.3d 242, 247 (Colo.2007); *Devonshire v. United States,* 691 A.2d 165, 168 (D.C.1997); *People v. Stechly,* 225 Ill.2d 246, 312 Ill.Dec. 268, 870 N.E.2d 333, 353 (2007) (plurality opinion); *Commonwealth v. Edwards,* 444 Mass. 526, 830 N.E.2d 158, 170 (2005); *State v. Romero,* 141 N.M. 403, 156 P.3d 694, 703 (2007). *But see State v. Langley,* 354 N.W.2d 389, 400 (Minn.1984). Other cases have noted that Federal Rule of Evidence 804(b)(6), which requires intent for a forfeiture, reflects the constitutional forfeiture doctrine. *See, e.g., United States v. Scott,* 284 F.3d 758, 762 (7th Cir.2002); *United States v. Cherry,* 217 F.3d 811, 815 (10th Cir.2000). In addition, a number of states have en-

coded the forfeiture exception with the intent requirement intact. *See, e.g.,* Cal. Evid.Code § 1350(a)(1) (1995); Del. R. Evid. 804(b)(6); Mich. R. Evid. 804(b)(6); N.D. R. Evid. 804(b)(6); Ohio R. Evid. 804(B)(6); Pa. R. Evid. 804(b)(6); Tenn. R. Evid. 804(b)(6); Vt. R. Evid. 804(b)(6).

The court cites a number of decisions as support for its departure from the forfeiture doctrine as it has been historically applied. It says much, though, that those contrary decisions either fail to actually provide such support or are of questionable persuasive value. In *United States v. Cromer,* for example, the Sixth Circuit rejected the government's argument that a "foolish strategic decision" made by the defendant while personally conducting a cross-examination should result in a forfeiture of the confrontation right. 389 F.3d 662, 679 (6th Cir.2004). The Sixth Circuit, in the language now cited by this court, simply noted that a forfeiture may occur only upon a showing of some *wrongful* conduct by the defendant, such as murder or intimidation. *Id. Cromer* merely reaffirmed that actual wrongdoing is a necessary element of the forfeiture doctrine, and, lacking any such wrongdoing on the record, the court had no occasion to, and did not, express any opinion on whether an intent to silence need also be shown.

**15.** In criticizing the conclusion I draw from the history of the forfeiture exception—that the exception has historically been grounded in intentional conduct aimed at preventing a witness from testifying—the court inadvertently reveals the crucial flaw in its reasoning. First, the court cites to an article that states, *"historically, forfeiture was limited to witness-tampering cases,* [but] after *Crawford* most courts have applied the doctrine * * * where witness tampering is not involved."* Myrna S. Raeder, *Domestic Violence Cases After* Davis: *Is the Glass Half Empty or Half Full?,* 15 J.L. & Pol'y 759, 778 (2007) (emphasis added). In

doing so, the court recognizes the historical underpinnings of the forfeiture-by-wrongdoing exception. Then, in its reliance on a series of cases decided since *Crawford* in support of its murder exception, the court establishes its willingness to ignore not only that history but also *Crawford's* mandate that the Confrontation Clause must be understood in the context of its historical roots. That is not to mention the fact that those post-*Crawford* cases on which Professor Raeder relies have been typified by their "lack of analysis, * * * apparent rote citation of language, and * * * disinclination to examine the facts of the precedents." Flanagan, *supra,* at 1235.

*United States v. Rouco*, 765 F.2d 983 (11th Cir.1985), is similarly inapposite. In *Rouco*, the challenged statement was that of an undercover agent of the United States Bureau of Alcohol, Tobacco and Firearms who had purchased illegal weapons and cocaine from the defendant and whose identity as an undercover agent had become known to the defendant shortly before the defendant shot and killed the agent. *Id.* at 986–87. As a result of the defendant having killed the agent, the agent was not available to testify about the defendant's illegal weapons and cocaine sales. *Id.* at 994. Thus, *Rouco* involved a classic case in which application of the forfeiture by wrongdoing is appropriate-the defendant in *Rouco* clearly acted upon a strong incentive to eliminate the chief *witness* against him related to the weapons and cocaine offenses. That incentive is at the very heart of the forfeiture doctrine, *see Steele*, 684 F.2d at 1201–02, and is wholly lacking in the case before us for decision.[16] The court in *United States v. Garcia–Meza*, on the other hand, based its decision on its belief that Fed.R.Evid. 804(b)(6) provided no guidance as to the contours of the Confrontation Clause. 403 F.3d 364, 370 (6th Cir.2005). That particular conclusion is called into question, if not contradicted entirely, by the Supreme Court's contrary statements in *Davis*. *See* 126 S.Ct. at 2280; *see also infra* Part II.B(ii). The Wisconsin Supreme Court relied on that same problematic conclusion, and further admitted that its decision was based on a belief that "the broad view of forfeiture by wrongdoing * * * *utilized by various jurisdictions since Crawford's release* is essential." *State v. Jensen*, 299 Wis.2d 267, 727 N.W.2d 518, 534–35 (2007) (emphasis added). A similar intent to circumvent *Crawford* was alluded to by the California Supreme Court. *See People v. Giles*, 40 Cal.4th 833, 55 Cal.Rptr.3d 133, 152 P.3d 433, 444 (2007), *cert. granted*, —— U.S. ——, 128 S.Ct. 976, 169 L.Ed.2d 800 (2008) (noting that *Crawford* made use of the forfeiture doctrine more necessary and "conclud[ing] that, to protect the integrity of their proceedings, post-*Crawford* courts * * * have correctly applied the forfeiture doctrine in a necessary, equitable manner"). The Supreme Court in *Davis* explicitly rejected this kind of post-*Crawford* expansionism, and refused to "vitiate constitutional guarantees when they have the effect of allowing the guilty to go free." 126 S.Ct. at 2280. The court also claims that *Moreno* and *Stechly* support the existence of a "murder exception" to the Confrontation Clause. Neither case, however, involved a murder. *See Moreno*, 160 P.3d at 243 (sexual assault); *Stechly*, 312 Ill. Dec. 268, 870 N.E.2d at 338 (same). Thus, any support for a "murder exception" in either is dicta.

Viewed from a historical perspective, the court's reliance on the existence of an unwritten "murder exception" to the Confrontation Clause is patently absurd. If such an exception existed, it would be readily apparent. It is not as if the victim's absence at murder trials constitutes a peculiarly modern problem of which the Framers of the Sixth Amendment were unaware and could never have anticipated, yet the court cites nothing in ancient continental law, English case law, the Federalist Papers, the Antifederalist writings, *Crawford, Davis*, the numerous scholarly

**16.** While the *Rouco* court did not make this point explicitly, it is notable that the two forfeiture cases to which it cited in reaching its decision—*Carlson* and *Thevis*—both applied a limited forfeiture doctrine, rather than an expansive doctrine automatically applicable to all murder defendants. This is of particular importance when it is remembered that *Thevis*, which required an intent to silence the witness, is binding precedent in the 11th Circuit. *See Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir.1982).

articles discussing the Sixth Amendment, or any case decided in the 400 years leading up to *Crawford* to indicate that there was historically such a thing as a "murder exception" to the confrontation right. Such an omission is telling. Given the sheer number of murder trials that have come through this nation's courts, one would expect a "murder exception" to be solidly established if it was anything but a modern construct designed to evade *Crawford*. It is also curious that, despite the fact that many witness tampering cases involve the murder of the witness, *see, e.g., Houlihan*, 92 F.3d at 1278, the court cites no pre-*Crawford* witness tampering cases indicating that intent need not be shown because of the application of a "murder exception." If such an exception existed pre-*Crawford*, it seems that more courts faced with witness tampering would have applied it, rather than go through the trouble of analyzing whether the defendant intended to silence the witness.

In actuality, the court fails to identify any historical support for a "murder exception" to the Confrontation Clause simply because no such support exists. This is shown by the decision in *Woodcock's Case*, (1789) 1 Leach 500 (Eng.), which directly addressed a circumstance in which the defendant's murder had silenced the key witness against him. Woodcock stood accused of the murder of his wife, who died shortly after giving a signed statement to a magistrate. *Id.* at 500–01. Thus, the court was faced with an instance in which today's greatly-expanded forfeiture doctrine would have been applied, if it

had been available. In addressing whether that statement could be admitted to the jury, though, the court immediately noted a pressing dilemma: the statement "was not taken * * * in a case where the prisoner was brought before [the magistrate] in custody; the prisoner therefore had no opportunity of contradicting the facts it contains." *Id.* at 502. If, as the court today contends, there was a broad "murder exception" to the confrontation right, then surely these facts would not have posed a problem for the *Woodcock* court, which was itself presented with a defendant charged with murdering his spouse. As the *Woodcock* court acknowledged, however, the lack of cross-examination would have barred the admission of the testimony if not for the exception for dying declarations, the application of which did not turn on the prisoner's previous opportunity for cross-examination. *Id.* at 502–03.[17] If, in fact, there was any need for the "murder exception" adopted by this court, cases such as *Woodcock* would have recognized as much, and the dying declaration exception would have been deemed unnecessary in murder prosecutions.[18]

In challenging the historical evidence, the court's reasoning is fatally flawed. First, the court cites two civil cases for the proposition—one that I do not challenge—that there exists an equitable doctrine of "clean hands." Neither case cited by the court, however, involves the blanket application of that doctrine to a criminal prosecution or even so much as hints that the doctrine may wholly trump the Confrontation Clause. *See Glus v. Brooklyn E. Dist.*

---

17. This, of course, is not to conflate the numerous modern hearsay exceptions with exceptions to the Confrontation Clause. The dying declarations exception, like the forfeiture doctrine, is unique in that it was historically considered an exception to the confrontation right. *See Crawford*, 541 U.S. at 56 n. 6, 124 S.Ct. 1354.

18. In all likelihood, if this court is correct that there exists a "murder exception" to the Confrontation Clause, *Woodcock's Case* reveals that exception's identity: the exception for dying declarations.

*Terminal,* 359 U.S. 231, 231–33, 79 S.Ct. 760, 3 L.Ed.2d 770 (1959) (applying doctrine to action brought "under the Federal Employers' Liability Act to recover damages for an industrial disease"); *Wellner v. Eckstein,* 105 Minn. 444, 446, 117 N.W. 830, 831 (1908) (addressing proper distribution of the property of an individual murdered by his wife).[19] Further, to invoke the clean hands doctrine would be to forget that a forfeiture is triggered not by mere wrongful conduct, but by the acts of individuals who *seek to undermine the judicial process. Davis,* 547 U.S. at 832–33, 126 S.Ct. 2266.[20] Relying on *Lord Morley's Case* and *McDaniel v. State,* 16 Miss. (8 S. & M.) 401 (1847), the court next claims that it is actually applying the forfeiture doctrine as it was historically understood. As to *Lord Morley's Case,* the court makes the error, discussed above, of reading that decision out of historical context. *See* Kry, *supra,* at 500–01 (pointing out that such a broad reading implicitly relies on an erroneous inference that cross-examination was not also a prerequisite of admissibility). The problem with the court's use of *McDaniel* is that, despite that decision's language seemingly implicating a forfeiture, the *McDaniel* court did not apply the forfeiture doctrine, resting

instead on the exception for dying declarations.[21] 16 Miss. at 415, 419.

In addition to denying the historical evidence, the court also relies upon a laundry list of cases decided after *Crawford.* I do not deny that an ongoing modern trend has been to cast aside the historical protections of the Confrontation Clause so as to ensure that those accused of murder will be convicted. *See, e.g., State v. Sanchez,* 341 Mont. 240, 177 P.3d 444, 454 (2008) (basing decision not on historical application of forfeiture doctrine, but on "post-*Crawford* decisions"). Despite the court's insistence, however, the contours of the Confrontation Clause and its exceptions are not determined by modern trends or majorities, but by the manner in which that clause was historically understood. *See Crawford,* 541 U.S. at 43, 124 S.Ct. 1354 ("We must * * * turn to the historical background of the Clause to understand its meaning."); *id.* at 54, 124 S.Ct. 1354 ("[T]he [Sixth Amendment] is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding."). That history provides no foundation for an ill-conceived "murder exception" to the confrontation right. Instead, the historical evidence indicates the opposite, that the forfeiture

19. While it is entirely possible that the court considers the right to confrontation of no more consequence than a statute of limitations, *see Glus,* 359 U.S. at 231–32, 79 S.Ct. 760, or the proper distribution of property, *see Wellner,* 105 Minn. at 446, 117 N.W. at 831, it is unlikely that the Framers or Sir Walter Raleigh would share that sentiment.

20. *Davis's* focus on individuals who *seek* to undermine the judicial process is entirely consistent with the Court's application of the clean hands doctrine in *Glus.* In that case, the Court determined that a statute of limitations was inapplicable when the party invoking the limitations period had misrepresented to the plaintiff the amount of time available in

which to bring his claim. *Glus,* 359 U.S. at 235, 79 S.Ct. 760. Put simply, the defendants in *Glus* sought to undermine the judicial process by misstating the statute of limitations period upon which they later relied.

21. It says much about the *McDaniel* court's reasoning that the case upon which it relied for its constitutional interpretation *itself* rested on the dying declarations exception, as well as a particularly dubious claim that the right to confrontation was inapplicable because the person who overheard the victim's statement, not the victim himself, was the witness of whom cross-examination was constitutionally mandated. *Woodsides v. State,* 3 Miss. (2 Howard) 655, 664–65 (1837).

doctrine was from its very inception a limited doctrine, one which recognized the core importance of a defendant's opportunity to question the witnesses against him.

### ii. Codification of the Forfeiture Exception in the Federal Rules of Evidence

In 1997, Federal Rule of Evidence 804(b)(6) was adopted, providing that the statements of an unavailable witness could be admitted "against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." When that rule was adopted, the law of forfeiture was so overwhelmingly uniform that the rule's drafters "never questioned the intent element." Flanagan, *supra*, at 1213. In particular, the drafters of the rule looked to *United States v. Thevis*, 665 F.2d 616 (5th Cir.1982). Flanagan, *supra*, at 1212. In *Thevis*, the Fifth Circuit recognized the dangers of an overbroad forfeiture rule as adopted by the court today, noting that the forfeiture doctrine

> does not permit wholesale admission of hearsay evidence when a witness is unavailable. [Rather], a hearsay statement of a potential witness is admissible only if the government shows * * * that (1) the defendant caused the witness' unavailability (2) for the purpose of preventing that witness from testifying at trial. Thus hearsay evidence would not be admissible simply because the witness was missing.

*Thevis*, 665 F.2d at 633 n. 17.

While the rules committee records indicate that the rule was "limited to witness tampering cases," the committee declined to include an explicit reference to witness tampering because it believed the excep-

tion clearly applied "only when the object was to procure the witness's absence." Flanagan, *supra*, at 1213. The lack of any serious debate regarding the inclusion of an intent requirement in Rule 804(b)(6) makes even more clear that such intent is an integral part of the forfeiture doctrine.

Although the existence of a specific federal rule of evidence typically would have no meaningful impact on our consideration of a constitutional issue, in *Davis* the Supreme Court acknowledged the constitutional underpinnings of Rule 804(b)(6). In that decision, the Court observed that Rule 804(b)(6) "codifies the forfeiture doctrine." 126 S.Ct. at 2280. This use of the word "codifies" carries particular significance. "Codification" is the process of "compiling, arranging, and systematizing * * * a discrete branch of the law, into an ordered code." *Black's Law Dictionary* 275 (8th ed.2004). The Court's use of this particular term strongly suggests that Rule 804(b)(6) reflects the contours of the constitutional forfeiture doctrine.[22] Seeing that Rule 804(b)(6) is a codification of the constitutional rule, it would follow that the constitutional rule similarly requires the element of intent.

Further, because the *Davis* Court addressed the forfeiture doctrine not as a matter of evidentiary law, but as a constitutional issue, its invocation of Rule 804(b)(6) is a strong indication of the proper content of the constitutional forfeiture rule. The Court clearly was not implying that a particular rule of evidence was to be applied on remand. In discussing the forfeiture rule, the Court was directing its comments to the Indiana Supreme Court, not a federal court bound by the federal rules of evidence. Nor could the Court

---

**22.** Decisions before *Davis* similarly recognized that Rule 804(b)(6) was a codification of the common law constitutional doctrine. *See,* *e.g., United States v. Gray*, 405 F.3d 227, 241 (4th Cir.2005); *United States v. Ochoa*, 229 F.3d 631, 639 (7th Cir.2000).

have been interpreting Indiana evidentiary law, since it is well established that the Supreme Court does not decide state law. *Cf. Fox Film Corp. v. Muller*, 296 U.S. 207, 210, 56 S.Ct. 183, 80 L.Ed. 158 (1935). Given that state courts are not bound by the federal rules of evidence, the Court's mention of Rule 804(b)(6) indicates that the rule is rooted in constitutional requirements. If the Court had not meant to provide guidance on the constitutional forfeiture rule to the Indiana courts, any reference to Rule 804(b)(6) would have been unnecessary. *Cf. Dowling v. United States*, 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990) (noting that the Federal Rules of Evidence are generally "nonconstitutional sources" of law). Only if Rule 804(b)(6) had a constitutional basis would it have been in any way relevant to the Indiana Supreme Court's decision on remand, since *Crawford* generally severed confrontation analysis from the "vagaries of the rules of evidence." 541 U.S. at 61, 124 S.Ct. 1354.

To say that the Rule 804(b)(6) codifies the forfeiture doctrine is not to say, as this court would insist, that the federal rule itself "has the power to force the common law and constitution to conform to its dictates." *Stechly*, 312 Ill.Dec. 268, 870 N.E.2d at 351 (plurality opinion). Rather, it is to say that Rule 804(b)(6) is "a reflection of the common law, to describe how the common law in fact operates. That is what a 'codification' is." *Id.* (citation omitted). Contrary to the court's reading of *Crawford*, the mere fact that an exception to the confrontation right happens to be codified in the rules of evidence does not render that exception a nullity. For example, Fed.R.Evid. 804(b)(2) codifies the dying declaration hearsay exception, which the Supreme Court indicated may itself be a historical exception to the confrontation right. *See Crawford*, 541 U.S. at 56 n. 6, 124 S.Ct. 1354 ("The one deviation we have found involves dying declarations. The existence of that exception as a general rule of criminal hearsay law cannot be disputed."). Properly read, then, nothing in *Crawford* bars our acknowledgement of the constitutional basis of Rule 804(b)(6).

## C. Equity and the Confrontation Right

The court also distorts the Supreme Court's statement in *Crawford* that the forfeiture doctrine is an equitable principle. In doing so, the court ignores the fact that the equitable balancing at the heart of the forfeiture doctrine is meant to respond to a particular harm—the subversion of the judicial process—not merely the general problems that arise whenever the absence of a witness makes it more difficult to obtain a conviction.

While the equitable balance clearly cuts in favor of preventing defendants from using the Sixth Amendment to exploit the judicial process, when there has been no showing that the defendant has manipulated the system to gain an unfair advantage at trial, there is no equitable interest to be balanced. *See Moreno*, 160 P.3d at 246 ("To find the forfeiture of a protection so integral to the truth-seeking process, quite apart from any design or attempt by the defendant to subvert that process, would * * * divorce the forfeiture by wrongdoing doctrine from its very reason for existing * * *."). That is to say, without a showing having been made that the defendant has intentionally attempted to subvert the justice process, a court has simply no reason to engage in an equitable balancing involving such a core constitutional right. *See Stechly*, 312 Ill.Dec. 268, 870 N.E.2d at 349 (plurality opinion) (observing that the rationale behind the forfeiture rule is inapplicable when defendant lacked intent to silence, as it is "impossible to deter those who do not act intentionally").

When the concerns attendant to witness tampering cases are set aside, the court's unspoken "equitable interest" boils down to this: *Crawford* has made it substantially more difficult to admit the statements of murder victims at trial, and without such statements, murder convictions are harder to obtain. The Supreme Court, however, has already made it clear that this interest is insufficient to justify the wholesale evisceration of the Confrontation Clause. When the *Davis* Court was asked in no uncertain terms to allow "greater flexibility in the use of testimonial evidence" in domestic violence cases, the Court flatly refused. *Davis*, 126 S.Ct. at 2279–80. That refusal was not because the Court was unaware of the difficulties prosecutors face in cases involving domestic violence, however. In fact, the amici in *Davis* presented a substantial body of statistical evidence showing *Crawford's* negative impact on domestic-violence prosecutions throughout the nation, and explicitly noted that the forfeiture doctrine's intent requirement poses a barrier to the successful prosecution of violent offenders. *See generally Brief of Amici Curiae the National Network to End Domestic Violence, et. al. in Support of Respondents, Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). Faced with these facts, the Court nevertheless refused to allow emotion to control its constitutional interpretation of the forfeiture doctrine, stating:

> [Domestic violence] is notoriously susceptible to intimidation or coercion of the victim to ensure that she does not testify at trial. When this occurs, the Confrontation Clause gives the criminal a windfall. We may not, however, vitiate constitutional guarantees when they have the effect of allowing the guilty to go free. But when defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce. While defendants have no duty to assist the State in proving their guilt, they *do* have the duty to refrain from acting in ways that destroy the integrity of the criminal-trial system.

*Davis*, 126 S.Ct. at 2279–80 (citation omitted). By focusing on those who "seek to undermine the judicial process," the Court made clear the unique, specific harm that the forfeiture doctrine is crafted to prevent: *intentional* interference with the judicial process.

It is hard to misconstrue this statement as mere dicta, or as leaving the door open for the expansion of the forfeiture doctrine that this court now embraces—the Court was faced with an explicit request to allow a broader forfeiture exception to *Crawford*, and it responded by making clear that no court has the power to "vitiate constitutional guarantees" simply because "they have the effect of allowing the guilty to go free." *Id.* at 2280. When the nation's highest court makes clear that it will not expand the forfeiture doctrine, it is simply beyond our authority to act in its stead.

Nonetheless, both this court and *Sanchez*, 177 P.3d at 456, read a key phrase out of *Davis* so as to justify the creation of a "murder exception," arguing that murder necessarily "undermine[s] the judicial process and its search for truth" and thus justifies the application of a forfeiture. Even if I were to assume that the absence of a witness sufficiently undermines the search for truth so as to justify encroachment on constitutional rights, neither *Sanchez* nor this court explain how a charge of murder, without more, shows that a defendant *sought to undermine the judicial process*. Without that crucial element, no forfeiture can result under a fair reading of

*Davis.* It is but speculation on the court's part that Her *sought* to undermine the judicial process, unless the court would go so far as to claim that a murder defendant's mere assertion of a confrontation objection is sufficient to show that he seeks to undermine the judicial process. Any implicit invocation of Her's intent to prevent Vang's testimony is particularly misplaced here, considering that such intent is not a necessary element of domestic abuse homicide or second-degree murder that had to be found by the jury beyond a reasonable doubt when rendering its verdict. *See* Minn.Stat. § 609.185(a)(6) (requiring sole mental element be that crime be committed with extreme indifference to human life); *State v. Bradford,* 618 N.W.2d 782, 800 (Minn.2000) (same); *see also* Minn.Stat. § 609.19, subd. 1(1) (2006) (requiring only intent to cause death). For the court to make its own finding of an intent to prevent testimony on this record is both improper as a matter of law and contrary to the evidence.[23]

Finally, I would be remiss if I did not comment on the breadth of the court's "murder exception," which is astounding. The court, quoting *Sanchez,* 177 P.3d at 456, notes that "the natural result of a deliberate killing is *always* that the victim is unable to testify." The court further notes, "In that circumstance, where the defendant's 'intentional criminal act results in a victim-declarant's death,' the defendant will benefit from his 'wrongdoing if the defendant can use the death to exclude the victim-declarant's otherwise admissible testimony, regardless of whether the de-

fendant specifically intended to silence the victim-declarant.'" As a result, the court, in agreement with the Montana Supreme Court, concludes that "'[s]uch a result undermines the judicial process and threatens the integrity of court proceedings, and [that,] though courts may not 'vitiate constitutional guarantees when they have the effect of allowing the guilty to go free,' nor must they acquiesce in the destruction of the criminal-trial system's integrity.'"

If every murder undermines the judicial process and threatens the integrity of court proceedings as the court concludes, does the murder defendant also forfeit his or her rights under the Fourth and Fifth Amendments as well as other rights under the Sixth Amendment? Does an individual's attempt to hide or destroy a murder weapon result, on "equitable" grounds, in a forfeiture of the right to contest an illegal search of that individual's home for that weapon? Or, put in this court's broad terms, is it to be understood that every invocation of a constitutional right, by a defendant of whose guilt a court is certain, threatens the integrity of the judicial system? When the court's reasoning is followed to its logical conclusion, the only answer to these questions is yes. Only by placing punishment of the guilty above the rights enshrined in the Constitution, however, might we in good conscience abide by such an answer. But, as the late Justice Brennan said so well:

> This denigration of constitutional guarantees and *constitutionally mandated*

---

**23.** The court protests that it does not, and need not, make a finding of such intent. It is simply unclear how the court can, as required by *Davis,* conclude that Her *sought* to undermine the judicial process without finding, at minimum, a specific intent to prevent Vang from testifying. Without any explanation by the court as to how it would address this problem, aside from a weak argument that the *Davis* Court failed to insert the word "only" into its opinion, it appears that the court has simply chosen to ignore all statements in *Davis* that it finds inconsistent with its ultimate conclusion. While the insertion of additional language would have likely made *Davis* clearer, the lack of a single word is but a slender reed upon which to hang one's constitutional analysis.

*procedures,* relegated by the Court to the status of mere utilitarian tools, must appall citizens taught to expect judicial respect and support for their constitutional rights. Even if punishment of the "guilty" were society's highest value— and procedural safeguards denigrated to this end—in a constitution that a majority of the Members of this Court would prefer, that is not the ordering of priorities under the Constitution forged by the Framers, and this Court's sworn duty is to uphold that Constitution and not to frame its own. The procedural safeguards mandated in the Framers' Constitution are not admonitions to be tolerated only to the extent they serve functional purposes that ensure that the "guilty" are punished and the "innocent" freed; rather, every guarantee enshrined in the Constitution, our basic charter and the guarantor of our most precious liberties, is by it endowed with an independent vitality and value, and this Court is not free to curtail those constitutional guarantees even to punish the most obviously guilty.

*Stone v. Powell,* 428 U.S. 465, 523–24, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) (Brennan, J., dissenting). This court, charged with the duty of protecting constitutional rights, treads a dangerous path when it proclaims that a defendant's exercise of a constitutional right undermines the integrity of the judicial system.

### D. The Court's Reliance on Langley

The court's reliance on *State v. Langley,* 354 N.W.2d 389 (Minn.1984), to support its broad application of the forfeiture-by-wrongdoing doctrine is, at best, misguided. Although stare decisis requires a "compelling" reason before we will depart from precedent, it does not command blind deference to a wrongly decided case. Here, there are compelling reasons to depart from *Langley.* First, the *Langley* court

engaged in no discussion or analysis of the doctrine, but simply stated its conclusion that the defendant there "should not be afforded" his Sixth Amendment rights as a shield to protect him from the ramifications of having murdered his wife Rose because the evidence was strong that he had been the instrument of the denial of his own right of cross-examination. *Id.* at 400. Absent any discussion and analysis, it is impossible to know the basis for the court's conclusion. As troubling as the *Langley* court's conclusion is, given the complete lack of any analysis underlying that conclusion, it is even more troubling given the record before that court. A review of the briefs in *Langley* indicate that neither party raised or briefed the applicability of the forfeiture-by-wrongdoing doctrine to the court. Further, the two cases relied on by the *Langley* court to reach the conclusion that a defendant need not have intentionally procured the absence of a witness for the forfeiture doctrine to apply do not support that conclusion. The *Langley* court relied on *State v. Olson,* 291 N.W.2d 203 (Minn.1980), and *United States v. Carlson,* 547 F.2d 1346 (8th Cir.1976). *Id.* In *Olson,* we applied the traditional formulation of the forfeiture doctrine, stating that one who "procures the absence of a witness by threats, bribes, concealment or intimidation" has forfeited his confrontation right. *Olson,* 291 N.W.2d at 207. We also noted that, absent a conspiracy, a forfeiture occurs "when a defendant threatens a witness after he has been apprehended and causes the witness to remain mute." *Id.* (citing *Motes,* 178 U.S. at 471–74, 20 S.Ct. 993). *Olson* said nothing to suggest that the doctrine could be applied in the absence of intentional witness tampering. Similarly, *Carlson* considered the forfeiture doctrine necessary only to prevent defendants from exploiting the criminal justice process. *See*

*Carlson,* 547 F.2d at 1359 ("[T]he law [should not] permit an accused to subvert a criminal prosecution by causing witnesses not to testify at trial who have, at the pretrial stage, disclosed information which is inculpatory as to the accused.").

Finally, research indicates that *Langley* is an anomalous outlier.[24] As noted above, our discussion in *Olson* does not stand for the proposition on which the *Langley* court relied. Nor has my research turned up any other Minnesota case before *Langley* that stands for the existence of a "murder exception" to the confrontation right. *See, e.g., State v. Hansen,* 312 N.W.2d 96, 103–05 (Minn.1981) (finding no forfeiture, citing to federal and state cases all involving threats to witnesses); *Olson,* 291 N.W.2d at 207; *State v. Black,* 291 N.W.2d 208, 214 (Minn.1980) (citing *Carlson,* noting threats made to witness by defendant). My research also indicates that, since *Langley,* there are no reported cases citing *Langley* as defining the breadth of the forfeiture-by-wrongdoing doctrine, nor have we decided any case applying the doctrine as set out in *Langley.* Indeed, we have not decided any subsequent case in which a forfeiture was found without a showing of witness tampering of some sort. *See, e.g., Wright,* 726 N.W.2d at 482 (remanding for determination of whether intent to procure witness's unavailability was shown); *State v. Fields,* 679 N.W.2d 341, 347 (Minn.2004) (observing that defendant acted with intent to render witness unavailable); *State v. Byers,* 570 N.W.2d 487, 494–95 (Minn.1997) (noting defendant's attempts at intimidating witness); *State v. Peirce,* 364 N.W.2d 801, 807 (Minn.

1985) (noting that defendant threatened to kill witness if he testified).

I would also note that, when "the reasons for [a] rule have ceased to exist," we "ought not to blindly adhere to former decisions even though legally sound when the case was decided." *Johnson v. Chicago, B. & Q. R.R. Co.,* 243 Minn. 58, 69, 66 N.W.2d 763, 771 (1954). *Langley* was not legally sound when decided, and, until today, we have not followed it. Given the Court's pronouncements in *Davis* and *Crawford,* there is no reason to begin following it now.

For all of the foregoing reasons, I concur only in the result.

ANDERSON, PAUL H., Justice (concurring).

I join in the concurrence of Justice Page.

---

24. The court simply takes this statement out of context, arguing that other cases in our sister states—all decided decades after *Langley*—have reached similar results. That another jurisdiction articulated a constitutionally infirm justification for *Langley* decades after it was handed down does not alter the fact that *Langley* runs contrary to the absolute weight of the historical evidence—evidence determinative of the scope of the confrontation right, as well as any exceptions to that right. *See Crawford,* 541 U.S. at 43, 54, 124 S.Ct. 1354.